# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

| | | |
|---|---|---|
| **IGNACIO RAMOS, JR.,** | § | |
| **Movant,** | § | |
| | § | **EP-10-CV-108-KC** |
| **v.** | § | **EP-05-CR-856-KC-1** |
| | § | |
| **UNITED STATES OF AMERICA,** | § | |
| **Respondent.** | § | |

## MEMORANDUM OPINION AND ORDER

In a motion to vacate, set aside, or correct a sentence, pursuant to 28 U.S.C. § 2255 [ECF No. 291],[1] former United States Border Patrol Agent Ignacio Ramos, Jr. ("Movant"), challenges his convictions for assault with a dangerous weapon, assault with serious bodily injury, discharge of a firearm in relation to a crime of violence, and the deprivation of rights under color of law.  In his motion, Movant claims he was denied due process when the Government failed to disclose an investigator's report, due process when the Government introduced the false testimony of a witness during trial, the effective assistance of counsel before and during his trial, due process by virtue of the Fifth Circuit Court of Appeals' failure to address the prejudicial spillover from the vacated obstruction of justice counts, and the right to a fair trial as a result of the cumulative errors committed during his trial.  In its response [ECF No. 296], the United States of America ("the Government") argues that Movant's claims are without merit.  After reviewing the record, including Movant's reply to the Government's response [ECF No. 299]—and for the reasons discussed below—the Court concludes that Movant has failed to establish his entitlement to relief.  Accordingly, the Court will deny his motion and dismiss his civil cause with prejudice.  Additionally, the Court will deny Movant a certificate of appealability.

---

[1] "ECF No." in this context refers to the Electronic Case Filing number for documents docketed in EP-05-CR-856-KC-1.

# TABLE OF CONTENTS

I.  FACTUAL AND PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    A.  The Incident. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    B.  The Indictment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    C.  The Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        1.   Summary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        2.   Aldrete's Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        3.   Medical Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        4.   Agent Juarez's Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        5.   Agent Vasquez's Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        6.   Supervisory Agent Richard's Testimony. . . . . . . . . . . . . . . . . . . 14
        7.   Supervisory Agent Arnold's Testimony. . . . . . . . . . . . . . . . . . . 16
        8.   Agent Jacquez's Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
        9.   Agent Yrigoyen's Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        10.  Agent Mendoza's Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        11.  Special Agent Christopher Sanchez's Testimony. . . . . . . . . . . . . 19
        12.  Agent Compean's Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
        13.  Agent Ramos's Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
        14.  The Verdict and Sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    D.  The Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    E.  The Motion to Vacate, Set Aside, or Correct a Sentence. . . . . . . . . . . . . . 30
II. LEGAL STANDARD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
III. ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    A.  Failure to Disclose Report by Special Agent Christopher Sanchez. . . . . . . . . 33
        1.   The Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
        2.   Procedural Default. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
        3.   Legal Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
        4.   The Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
    B.  False Testimony of Agent Vasquez. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
        1.   The Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
        2.   Legal Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
        3.   The Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
    C.  Ineffective Assistance of Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
        1.   The Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
        2.   Legal Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
        3.   Failure to File a Motion to Dismiss Obstruction of Justice Counts. . . . . 47
        4.   Failure to File a Motion to Dismiss the Non-Obstruction Counts. . . . . . 51
             a.   Aldrete Had Fourth Amendment Rights. . . . . . . . . . . . . . . . 51
             b.   Agent Ramos Did Have Fair Warning. . . . . . . . . . . . . . . . . 54
        5.   Failure to File a Motion to Dismiss the Discharging a Firearm Count. . . 55
        6.   Failure to Challenge Jurisdictional Elements of Counts One, Two, and
             Three. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
        7.   Failure to Call a Use-of-Force Expert. . . . . . . . . . . . . . . . . . . . . . 59
        8.   Failure to Request a Theory-of-Defense Jury Instruction. . . . . . . . . . 62
        9.   Failure to Request an Apparent Danger Jury Instruction. . . . . . . . . . . 62

        10.     Failure to object to Jury Instructions. . . . . . . . . . . . . . . . . . . . . . . . . . . 64
        11.     Failure to Request Limiting Instructions on Border Patrol Policies. . . . . 66
        12.     Failure to Object to Closing Argument. . . . . . . . . . . . . . . . . . . . . . . . . 69
   D.     Prejudicial Spillover.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
   E.     Cumulative Error. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
IV.    HEARING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
V.     CERTIFICATE OF APPEALABILITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
VI.    CONCLUSION AND ORDERS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

# I.    FACTUAL AND PROCEDURAL HISTORY

## A.    The Incident

On February 17, 2005, Border Patrol Agents Ignacio Ramos ("Movant") and Jose Compean ("Agent Compean") were engaged in routine law enforcement activities along the United States-Mexico border near Fabens, Texas, when they gave chase to a van traveling at a high speed toward the Mexican border. After the driver abandoned his van and ran toward the Mexican border on foot, the agents followed him, fired their weapons at him and wounded him once, but did not prevent his escape into Mexico. After the incident, the two agents cleaned up the area of spent shells and did not report the weapon-firing incident to their supervisor, as required by well-established Border Patrol policies.

On February 28, 2005, Border Patrol Agent Rene Sanchez ("Agent Rene Sanchez"), then stationed in Wilcox, Arizona, received a telephone call from his mother-in-law, Gregoria Toquinto ("Toquinto"). She claimed a Border Patrol agent had shot her friend's son, Oswaldo Aldrete-Davila ("Aldrete"), in the back while trying to evade apprehension. Agent Rene Sanchez asked Toquinto to take a cell phone into Mexico so that he could speak directly to Aldrete. During their telephone conversation, Aldrete reported that on February 17, 2005, at the Rio Grande River near Fabens, Texas, a Border Patrol agent shot him in the back while he tried to

escape to Mexico.

Agent Rene Sanchez mentioned the shooting to his supervisor. The supervisor instructed him to gather more facts. Agent Rene Sanchez checked the Border Patrol Enforcement Tracking System, but found no record of a shooting in February. He also re-interviewed Aldrete and learned that Aldrete still had the bullet in his body. Agent Rene Sanchez and his supervisor both submitted memoranda concerning their investigation to the Department of Homeland Security.

Special Agent Christopher Sanchez ("Special Agent Christopher Sanchez") at the Department of Homeland Security's Inspector General's Office received copies of the memoranda regarding the shooting incident. He contacted a Border Patrol agent who explained to him that—according to Border Patrol policy—any discharge of a weapon must be reported to a supervisor within one hour. The Border Patrol agent added that there were no reports of a shooting by a Border Patrol agent on February 17, 2005. Special Agent Christopher Sanchez next obtained a copy of the recorded radio traffic for that day from the Fabens area, but he found nothing to indicate a shooting had occurred. He also compiled a list of the agents from the Fabens station on duty that day.

Special Agent Christopher Sanchez spoke with a truck driver who towed a van seized near Fabens on the day of the reported shooting. The truck driver took him to the exact spot where he found the van near the Rio Grande River. Special Agent Christopher Sanchez returned to the site with a metal detector in an unsuccessful attempt to find shell casings. Agents trained and certified to find evidence examined the area two days later. They looked by the levee, drainage ditch, and *vega*—the Spanish word for a strip of fertile flat land in a river bottom—near the Rio Grande River, but they did not find any shell casings.

Aldrete was reluctant to speak to Special Agent Christopher Sanchez until a prosecutor

provided a letter granting him limited use immunity, and Special Agent Christopher Sanchez gave him assurances the Government would not prosecute him for the incidents which occurred on February 17, 2005. Special Agent Christopher Sanchez spoke to Aldrete at the American consulate in Ciudad Juárez, Chihuahua, Mexico. Aldrete walked into the consulate on crutches carrying a large urine bag attached to a catheter.

Special Agent Christopher Sanchez arranged to have doctors at the William Beaumont Army Medical Center in El Paso, Texas, examine Aldrete. Special Agent Christopher Sanchez stood in the operating room as the doctors removed a bullet from Aldrete's body and took custody of it for ballistics tests. He also collected Border Patrol issued service firearms—Baretta .40 caliber semi-automatic pistols—from each of the agents on duty at the Fabens station on February 17, 2005. Forensics experts determined the bullet removed from Aldrete's body matched a bullet fired from the service firearm of Movant.

### B.    The Indictment

After hearing this evidence, a grand jury sitting in the Western District of Texas, El Paso Division, returned a third superseding indictment charging Movant with seven offenses. The alleged offenses included assault with the intent to commit murder and aiding and abetting, in violation of 18 U.S.C. §§ 2, 7(3), and 113(a)(1) ("count one"); assault with a dangerous weapon and aiding and abetting, in violation of 18 U.S.C. §§ 2, 7(3), and 113(a)(3) ("count two"); assault with serious bodily injury and aiding and abetting, in violation of 18 U.S.C. §§ 2, 7(3), and 113(a)(6) ("count three"); discharge of a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) ("count four"); tampering with an official proceeding by obstructing and impeding a contemporaneous investigation surrounding the shooting, in violation of 18 U.S.C. § 1512(c)(2) ("count eight"); tampering with an official proceeding by failing to

report the discharge of his firearm, in violation of 18 U.S.C. § 1512(c)(1) ("count nine"); and the

deprivation of rights under color of law, in violation of 18 U.S.C. § 242 ("count twelve").

### C. The Trial

#### 1. Summary

At Movant's trial,[2] the Government presented evidence showing that Aldrete had

abandoned his van near the Rio Grande River, that he was running on foot back toward Mexico,

that he posed no physical threat to Movant or others, and that he was shot in the buttocks. "It is

well established that the Fourth Amendment to the United States Constitution does not permit

officers to shoot a fleeing suspect unless the suspect poses a threat to the physical safety of the

officers or to the public."[3] Accordingly, the Government argued that because Aldrete was

running away from the Border Patrol agents toward the border with Mexico, Movant had no

reason to shoot him. Movant asserted the evidence supported a much different conclusion.

Movant testified that he saw a "shiny object" in Aldrete's left hand which appeared to be a

weapon, that the situation was tense, and that he felt in danger. Thus, Movant argued that he

acted as a reasonable officer in pursuit of a possibly dangerous drug smuggler, and that firing his

weapon was justified. After hearing the evidence, a unanimous jury rejected Movant's

arguments and found him guilty of all the charged offenses except count one, assault with the

intent to commit murder.

#### 2. Aldrete's Testimony

---

[2] References to the record on appeal and supplemental record are designated by the number of the record volume or supplemental record volume followed by "R." or "S.R." and the pertinent page number(s). References to the a Government Exhibit are "G. Ex" followed by the number(s).

[3] *United States v. Ramos*, 537 F.3d 439, 442 (5th Cir. 2008).

Aldrete, who testified pursuant to a grant of immunity co-extensive with use immunity under 18 U.S.C. §§ 6002 and 6003, explained that on February 17, 2005, drug dealers recruited him to deliver a van full of drugs within the United States for a fee of between $1,000 and $1,500.[4]  He admitted the recruiters told him he was delivering drugs.[5]  Aldrete explained he could see the van parked in the United States from his vantage point on the Mexican side of the Rio Grande River.[6]  He said he waded across the river and walked to the van.[7]  He claimed the van contained keys, large bundles, and a cell phone.[8]

Aldrete further testified that as he drove the van towards Fabens, he observed a marked Border Patrol vehicle.[9]  He explained that when the Border Patrol vehicle started following him, he decided to save himself by driving to the Rio Grande River and crossing back into Mexico.[10]  Aldrete said he then noticed a second Border Patrol vehicle following him.[11]  He admitted he ignored the posted speed limits and turned down a dirt road to an irrigation ditch.[12]

Aldrete testified that after a five-minute chase, he skidded to a stop at the rim of an

------

[4] 23 R. 152, 159, 165.

[5] 23 R. 159.

[6] 23 R. 158–60.

[7] *Id.*

[8] 23 R. 161, 164, 193, 198.

[9] 23 R. 72, 171.

[10] 23 R. 75, 173–75.

[11] 23 R. 76.

[12] 23 R. 78, 82.

irrigation ditch and became stuck in the dirt.[13]  He explained that south of the irrigation ditch was a levee with an elevated road, then the *vega*, and finally the Rio Grande River separating the United States from Mexico.[14]  According to Aldrete, the distance from the levee road to the river was approximately 230 feet.[15]

Aldrete said he got out of the van, entered the irrigation ditch, and, as he was running up the far side of the ditch, was blocked by a Border Patrol agent later identified as Agent Compean, the co-defendant in the instant criminal case.[16]  Aldrete claimed Agent Compean was pointing a rifle at him.[17]  He further claimed he stopped and raised his hands.[18]  According to Aldrete, Agent Compean said, "Stop, you shit Mexican."[19]  Aldrete said he told Agent Compean, "Take it easy man.  Don't hit me."[20]  Aldrete claimed Agent Compean took a full swing at him with the rifle, but missed, lost his balance, fell, and Aldrete ran away into the *vega* without looking back.[21]  Aldrete testified that as he was running through the *vega*, heading for the river, he realized the Border Patrol agents were shooting at him.[22]  Aldrete related that he fell, noticed a burning

---

[13] 23 R. 83, 86–88.

[14] 23 R. 84–86, 92, 95.

[15] 26 R. 145.

[16] 23 R. 101.

[17] 23 R. 105.

[18] 23 R. 189.

[19] 23 R. 106.

[20] *Id.*

[21] 23 R. 107, 110–12.

[22] 23 R. 113.

sensation in his left buttock, touched his buttock with his hand, and, when he looked at his hand, saw it was covered with blood.[23]  Aldrete claimed he was on the ground, near the edge of the river, waiting for the Border Patrol agents to come and arrest him.[24]  He added when the Border Patrol agents did not come, he got up and crossed the river back into Mexico.[25]

### 3. Medical Testimony

Urologist Todd Miller testified his examination of Aldrete's body revealed that it contained a number of bullet fragments, that his urethra was no longer intact, and that he could not have surgery to put his urethra back into working condition at that time.[26]  Orthopedic surgeon Winston Warme explained that bullet fragments caused Aldrete's injuries.[27]  He testified that a bullet entered Aldrete's body through his left buttocks.[28]  Based on the bullet's trajectory inside Aldrete, the doctor opined the person shooting would have been straight behind him or behind him at some angle.[29]

### 4. Agent Juarez's Testimony

Border Patrol Agent Oscar Juarez ("Agent Juarez") testified that on February 17, 2005, he was in his patrol unit, driving by himself on the levee, when he heard a radio transmission from

---

[23] 23 R. 115, 122.

[24] *Id.*

[25] 23 R. 125, 133.

[26] 24 R. 185, 187–89, 201, 202.

[27] 25 R. 187–88.

[28] 25 R. 189.

[29] 25 R. 199–200.

Agent Compean to be on the lookout for a blue minivan.[30] He said he left the levee to try to

locate the van.[31] Agent Juarez explained he spotted a gray van that he believed could have been

the subject of the alert.[32] He added he activated his emergency lights and followed the van,

planning to make a stop for an immigration check.[33] The van did not, however, stop.[34] Agent

Juarez said Movant joined the chase, and took over the high-speed pursuit.[35]

According to Agent Juarez's testimony, agents are required to notify their supervisor and

obtain approval before engaging in a high-speed chase.[36] He added the agents chasing the van

did not ask for authorization to pursue it.[37] Agent Juarez conceded it was unsafe to drive fast, but

he claimed, in this case, he did not see anyone endangered by the chase.[38]

Agent Juarez said his chase ended when he hit his brakes and his vehicle slid up to the

top of a canal or irrigation ditch.[39] He explained Movant had already parked next to the van and

had left his door open.[40] According to Agent Juarez, he saw Agent Compean standing on the

--------

[30] 24 R. 139, 142–43, 151.

[31] 24 R. 149–50.

[32] 24 R. 151–52; 25 R. 51.

[33] 24 R. 158–60; 25 R. 54, 62.

[34] 24 R. 160.

[35] 24 R. 163–64; 25 R. 61.

[36] 24 R. 165; 25 R. 65.

[37] 25 R. 10.

[38] 24 R. 165; 25 R. 72.

[39] 24 R. 169–70.

[40] 24 R. 166; 25 R. 29.

levee road on the other side of the canal holding a shotgun.[41]  Agent Juarez testified that as he

exited his vehicle and walked toward the ditch, he noticed the driver of the van in the ditch.[42]

When the driver of the van saw Agent Juarez, he quickly ran across the ditch.[43]  Agent Juarez

explained he did not pull his weapon because he did not feel threatened.[44]  Agent Juarez said he

observed Agent Compean move in front of the van driver's path and raise the butt of his

weapon.[45]  According to Agent Juarez, Agent Compean took a full swing at the driver of the van

with the shotgun.[46]  Agent Juarez added the van driver's hands were raised in the air at the time,

and he saw nothing in them.[47]  Agent Juarez testified that Agent Compean missed the driver of

the van, lost his balance, hit the ground, and dropped the shotgun.[48]  Agent Juarez observed as

Agent Compean got up and ran after the driver fleeing over the levee.[49]  Agent Juarez testified

that at no time did he see the driver of the van throw any dirt at Agent Compean.[50]  He further

claimed he never saw the driver of the van  touch Agent Compean.[51]  Agent Juarez testified that

---

[41] 24 R. 170–72; 25 R. 12.

[42] 24 R. 172–73.

[43] 24 R. 173, 175; 25 R. 12–13.

[44] 24 R. 173.

[45] 24 R. 174; 25 R. 137.

[46] 24 R. 175.

[47] 24 R. 175; 25 R. 120, 155.

[48] 24 R. 176–77.

[49] 24 R. 177–78; 25 R. 94.

[50] 24 R. 178.

[51] *Id.*

after van driver ran away from Agent Compean, he heard gunshots as he walked back toward his vehicle.[52]  He said he turned and saw Agent Compean shooting south toward Mexico.[53]

Agent Juarez testified that after Agent Compean discharged at least eleven rounds of ammunition from a clip and reloaded his weapon, he proceeded into the *vega*.[54]  Agent Juarez said he did not draw his own weapon because he did not feel there was a threat as the driver of the van was almost in Mexico.[55]  Agent Juarez claimed he never heard Agent Compean or anyone else say "stop" as the driver of the van was fleeing.[56]  Agent Juarez said he watched Agent Compean and Movant return from the direction of the *vega*, but they did not mention that the driver of the van had a gun or held a shiny object.[57]

### 5.     Agent Vasquez's Testimony

Border Patrol Agent Arturo Vasquez ("Agent Vasquez") testified that on February 17, 2005, he heard radio calls from Agent Compean.[58]  Later, he observed a gray van drive by at over fifty miles per hour followed by two patrol units.[59]  Agent Vasquez explained that he gave chase and when he arrived at the river, he saw Agent Juarez standing at the edge of the ditch within a

---

[52] 25 R. 15, 123.

[53] 25 R. 25.

[54] 25 R. 19, 23, 111.

[55] 25 R. 22.

[56] *Id.*

[57] 25 R. 24–25.

[58] 2nd S.R. 185.

[59] 2nd S.R. 185, 190–93.

few feet of a van.[60]  He said although the windows of his vehicle were rolled up, he heard

multiple gunshots.[61]  He added when he got out and asked about the location of the other agents,

Agent Juarez indicated that they were in the *vega*.[62]  Agent Vasquez said that as he drove away

from the scene to go back to his assigned area, he saw Agent Compean's vehicle approaching.[63]

According to Agent Vasquez, Agent Compean stopped, exited his vehicle, and walked to the

driver's side of Agent Vasquez's vehicle.  Agent Vasquez testified that when he asked Agent

Compean what happened, Agent Compean replied, "Well, that little bitch took me to the ground

and threw dirt on my face."[64]  When Agent Vasquez said he thought he heard some gunshots,

Agent Compean responded, "Well, I had to fire some rounds.  I went through a magazine

exchange, and then I fired some additional rounds"[65]

Agent Vasquez testified he received a radio message to return to the location of the

abandoned van.[66]  He added Agent Compean overheard the message and asked him to look for

additional casings.[67]  Although Agent Vasquez admitted he agreed to pick up the casings, he

added he knew he was required by Border Patrol policy to leave the casings in place for the

---

[60] 2nd S.R. 194–95.

[61] *Id.*

[62] 2nd S.R. 197–98.

[63] 2nd S.R. 208–10, 232.

[64] 2nd S.R. 211.

[65] 2nd S.R. 211, 272.

[66] 2nd S.R. 213, 215.

[67] 2nd S.R. 215, 279.

evidence team.[68]  On cross-examination, Agent Vasquez acknowledged that he believed it was a crime to destroy evidence.[69]

Agent Vasquez explained that he returned to the levee near where the abandoned van was parked and found five casings, picked them up, and threw them into the drainage canal.[70]  Agent Vasquez said he went with Special Agent Christopher Sanchez to the site about one month later and showed him where he had found the casings.[71]  Agent Vasquez further testified that on February 17, 2005, he called Agent Compean on his personal cell phone to let him know that he had found the casings and thrown them away.[72]  Agent Vasquez' cell phone records confirmed this call.[73]

### 6.    Supervisory Agent Richard's Testimony

Border Patrol Supervisory Agent Jonathan Richards ("Supervisory Agent Richards"), the Border Patrol's field operations supervisor for the Fabens Station, testified that on February 17, 2005, while in his office in the station, he heard Agent Compean call out that he had a vehicle leaving an area at a high rate of speed.[74]  He ordered Supervisory Agent Robert Arnold ("Supervisory Agent Arnold") "to respond to that area."[75]  He explained that because he did not

---

[68] 2nd S.R. 216, 284.

[69] 2nd S.R. 275.

[70] 2nd S.R. 221, 223.

[71] 2nd S.R. 218–20.

[72] 2nd S.R. 223–24.

[73] *Id.*

[74] 26 R. 184, 191.

[75] 26 R. 191.

hear further radio traffic, he attempted to contact some of the agents to try to find out what was going on.[76]  He said he proceeded to the location where he understood his agents had seized contraband.[77]  He explained he did not receive a request to conduct a "hot pursuit."[78]  Supervisory Agent Richards testified that when he asked Movant if everything was okay, Movant responded that it was.[79]  Movant also reported that the van driver fled through the canal, and "Agent Compean tried to grab him, or did some type of side to side movement to grab him, and fell down to the ground and got dirt in his eyes."[80]  Supervisory Agent Richards said he called out to Agent Compean, asking if he was okay, and Agent Compean said he was.[81]  Supervisory Agent Richards said that the agents "needed to put this stuff over the radio and the repeater, and let us know what's going on."[82]  He explained he did not call the sector evidence team because he was not aware that there had been a shooting.[83]  Back at the station, Supervisory Agent Richards added he asked Agent Compean on two occasions if he had been assaulted, and Agent Compean responded, "no."[84]  Supervisory Agent Richards claimed he first learned of shooting on March

---

[76] 26 R. 188, 192–93.

[77] 26 R. 195.

[78] 26 R. 197.

[79] 26 R. 210.

[80] 26 R. 211.

[81] 26 R. 212.

[82] 26 R. 214–15.

[83] 26 R. 224–26.

[84] 26 R. 217.

23, 2005, when he was interviewed by Special Agent Christopher Sanchez.[85]

### 7. Supervisory Agent Arnold's Testimony

Supervisory Agent Arnold testified that on February 17, 2005, after he heard radio traffic concerning a van, Supervisory Agent Richards directed him to "go out and see what was going on."[86] He explained he initially "took off in the wrong direction,"[87] but arrived at the location of the abandoned van just after Supervisory Agent Richards.[88] He further testified that when he arrived, all of the agents were looking at sacks of marijuana inside the van.[89] Back at the station, he overheard Supervisory Agent Richards ask Agent Compean if he was "okay" and "did anything happen," and Compean responded he was "okay" and "[n]othing happened."[90] He added Compean did not say that he had struggled with a suspect or had shot at anyone.[91] Supervisory Agent Arnold maintained the first time he learned that a firearm had been discharged on February 17, 2005, was in March from Supervisory Agent Robinson.[92]

### 8. Agent Jacquez's Testimony

Border Patrol Agent David Jacquez ("Agent Jacquez") testified that on February 17, 2005, he was patrolling east of the Fabens Port of Entry when he heard Agent Compean's calls

---

[85] 26 R. 239–41.

[86] 27 R. 62, 66

[87] 27 R. 68.

[88] 27 R. 72.

[89] 27 R. 73.

[90] 27 R. 77.

[91] 27 R. 77.

[92] 27 R. 77.

on the radio.[93]  He said he proceeded to the Rio Grande River where he saw Movant and Agent Compean walking on top of the levee.[94]  He claimed Movant told his supervisor and the other agents that the driver of the van had gotten into a physical altercation with Agent Compean, and that Movant had gone after him.[95]  He added that no one spoke at the scene about seeing a gun or of a shooting.[96]  Agent Jacquez testified that after he returned to the station, Agent Vasquez told him Agent Compean had fired some shots.[97]  Agent Jacquez said when he asked Agent Compean what had happened, Agent Compean explained "when the driver got down into the drainage ditch, that he told the driver to stop and the driver never stopped.  And that he tried to hit him with the shotgun."[98]  Agent Jacquez said he understood from Agent Compean's account that he had missed when he was swinging the shotgun and had slipped into the drainage ditch.[99]  Agent Compean did not tell Agent Jacquez that he was in fear for his life trying to apprehend the fleeing driver, or that he had an altercation with the driver, or that the driver assaulted him.[100]  Agent Compean also did not tell Agent Jacquez that he thought the driver had a gun, or that he saw a shiny object in the driver's hand.[101]  Agent Compean admitted to Agent Jacquez "that he shot at

---

[93] 26 R. 67–68, 81.

[94] 26 R. 69, 71.

[95] 26 R. 73.

[96] 26 R. 69–70.

[97] 26 R. 75.

[98] 26 R. 76.

[99] 26 R. 76–77.

[100] 26 R. 79.

[101] 26 R. 80.

the driver of the van," and then "chased after the driver."[102]

### 9. **Agent Yrigoyen's Testimony**

Border Patrol Agent Lorenzo Yrigoyen ("Agent Yrigoyen") testified that on February 17,

2005, he heard Agent Compean's radio calls and Movant's transmission that a van was headed

southbound towards Mexico.[103]  Agent Yrigoyen said he drove on the levee road with his partner

and observed Agent Compean and Movant standing together.[104]  Agent Yrigoyen said after he

exited his vehicle, his partner pointed out an individual in the agricultural fields in Mexico.[105]

Agent Yrigoyen testified he saw a white car pull up and a person get out to assist an individual

crossing the field.[106]

### 10. **Agent Mendoza's Testimony**

Border Patrol Agent Jose Luis Mendoza ("Agent Mendoza") testified that on February

17, 2005, he heard Agent Compean's radio call to watch for a van, and also Movant's message,

on local radio traffic, that he had a visual on the van as it made a U-turn and headed back south,

towards Agent Mendoza's position.[107]  Agent Mendoza said he saw the van race by followed

closely by two patrol units.[108]  Agent Mendoza followed the vehicles to the drainage ditch, and

---

[102] 26 R. 77–78.

[103] 26 R. 124, 127.

[104] 26 R. 128–30.

[105] 26 R. 134–35.

[106] 26 R. 139.

[107] 26 R. 14–15.

[108] 26 R. 17–19.

parked behind the other units.[109]  He overheard Agent Vasquez say something about a shotgun on the ground, but no one at the scene mentioned a shooting.[110]

Agent Mendoza said he assumed the van driver had fled, and Agents Compean and Movant had tried to apprehend him.[111]  He recalled that either Agent Compean or Movant said that someone on the Mexican side of the river had picked up the van driver, but neither mentioned shooting at the driver.[112]  According to Agent Mendoza, after they arrived back at the station, he noticed Agent Compean—who was sitting at a computer filling out a drug seizure form—had a small amount of blood on his chin.[113]  When Agent Mendoza asked what happened, Agent Compean replied "he . . . slipped on the levee while trying to apprehend the driver."[114] Agent Mendoza added Agent Compean never claimed the fleeing person tried to assault him or threw dirt in his eyes.[115]

### 11.  Special Agent Christopher Sanchez's Testimony

Special Agent Christopher Sanchez testified Agent Compean waived his *Miranda* rights after his arrest.  Agent Compean explained on the date of the incident, he recalled standing at the edge of a canal with a shotgun in his hands when he saw the driver of the van, later identified as

---

[109] 26 R. 21.

[110] 26 R. 22, 24.

[111] 26 R. 28.

[112] 26 R. 28.

[113] 26 R. 31–32.

[114] 26 R. 33.

[115] 26 R. 34.

Aldrete, coming up the south side of the ditch.[116]  Compean claimed he told Aldrete, in Spanish, to stop and put his hands up.[117]  Agent Compean admitted that the driver raised his hands, but when other agents arrived, he heard someone yell, "hit him, hit him."[118]  Agent Compean responded by "attempt[ing] to push Aldrete into the drainage ditch" with the butt of his shotgun.[119]  Agent Compean then explained that "[w]hen he was maneuvering to push Aldrete back . . . he slipped into the drainage ditch."[120]  He added that "when he slipped, Aldrete-Davila ran around him and over the levee."[121]  Agent Compean explained "he recovered from slipping into the drainage ditch and ran after Mr. Davila," going "over the levee, and he . . . [j]umped on the back of Aldrete-Davila, and they rolled into the south slope of the levee into the *vega*, and they wrestled."[122]  Then, according to Agent Compean's oral statement, "Aldrete-Davila might have thrown dirt in his eyes," but according to his written statement, he said he just thought he "got dirt" in his eyes.[123]  Agent Compean claimed "Aldrete-Davila broke free from his grasp and began to run toward Mexico."[124]  Agent Compean said that when Aldrete broke free, "he did not

---

[116] 28 R. 24–25.

[117] *Id.*

[118] 28 R. 27.

[119] 28 R. 28.

[120] 28 R. 30.

[121] 28 R. 30.

[122] 28 R. 31.

[123] 28 R. 32–33, 42.

[124] 28 R. 33.

observe any weapons [in his] hands or anything."[125]  His post-arrest account further explained

that, as Aldrete was running toward Mexico, Agent Compean "observed something shiny" in

Aldrete-Davila's *left* hand "which he thought was a gun, and that's why he started firing."[126]

Agent Compean added, however, "he was never certain that Aldrete-Davila had a gun."[127]  Also,

Compean never alleged the "shiny object" was pointed at him.[128]  He claimed he first saw the

shiny object while he was in the *vega.*[129]

Special Agent Christopher Sanchez also testified that Aldrete was *right*-handed, and that

he used his *right* hand in writing and reaching for items.[130]  Further, Aldrete had told him, "I did

not have a gun or anything shiny in my hand, and I'm righthanded."[131]

Agent Compean admitted to Special Agent Christopher Sanchez he shot at Aldrete "10 or

11 times," and "he stopped shooting at Aldrete-Davila just before he reached the bank of the Rio

Grande River."[132]  Agent Compean told Special Agent Christopher Sanchez that from his vantage

point in the middle of the *vega*, he saw "Aldrete-Davila come up on the south side of the river,

on the Mexican *vega.*"[133]  Compean confessed he "observed Aldrete-Davila limping and assumed

---

[125] 28 R. 33.

[126] 28 R. 33–34.

[127] 28 R. 36.

[128] 28 R. 34.

[129] 28 R. 34.

[130] 28 R. 34–35.

[131] 28 R. 57–58.

[132] 28 R. 37.

[133] 28 R. 36–37.

he had been shot," and that was when "he went back to the levee, to pick up his casings on the levee."[134]  Agent Compean did not say he retrieved his casings in the *vega*, where he alleged he did the shooting.  Agent Compean also admitted to Special Agent Christopher Sanchez that while he was exiting the levee, he said to Agent Vasquez, "I didn't pick up all the casings, can you go back and pick up some of the casings?"[135]  Agent Compean reported that "Vasquez called him at the station and told him that he had picked up the casings and threw them in the drainage ditch."[136]  Agent Compean confessed to Special Agent Christopher Sanchez that he did not report that he discharged his firearm because, "I thought I would get in trouble"[137]  Finally, Agent Compean admitted in his written statement that when he shot at Aldrete, he shot to kill.[138]

Special Agent Christopher Sanchez also testified that, based on his analysis of the incident, the shooting occurred on United States Government property which "starts at the foot of the north slope of the levee" and "goes to the middle of [the] Rio Grande."[139]

### 12.    Agent Compean's Testimony

Agent Compean testified at trial that Aldrete initially "put his hands up" while in the ditch.[140]  He characterized his use of the shotgun as an attempt to "push" the van driver back into

---

[134] 28 R. 36–38

[135] 28 R. 40.

[136] 28 R. 41.

[137] *Id.*

[138] 28 R. 41-42.

[139] 24 R. 93-94.

[140] 29 R. 154.

the ditch.[141]  Agent Compean related that "[w]hen he was maneuvering to push Aldrete-Davila back into the drainage ditch . . . he slipped into the drainage ditch."[142]  He stated that "when he slipped, Aldrete-Davila ran around him and over the levee."[143]  After the van driver ran away, Agent Compean claimed he got up, caught up with the fleeing driver, and tackled him.[144]  Agent Compean testified that the driver then threw dirt in his face and got away.[145]  Agent Compean asserted that as the driver ran toward the levee, he turned around and pointed something both shiny and black at him.[146]  In response, Agent Compean claims he drew his weapon, and, firing from one knee, shot off ten to eleven rounds.[147]

Agent Compean claimed he withdrew the magazine from his weapon and attempted to make a magazine change, but he had trouble getting the replacement magazine out of his belt.[148]  He said he did not see Movant pass his position, and, as he tried to reload, he heard another shot.[149]  According to Agent Compean, Movant did not come back to his location, he walked up to Movant.[150]  As they walked back toward their vehicles, Agent Compean admitted he picked up

---

[141] 29 R. 158.

[142] 28 R. 30.

[143] *Id.*

[144] 29 R. 156, 159–60.

[145] 29 R. 160–61.

[146] 29 R. 161–62.

[147] 29 R. 162–63.

[148] 29 R. 163.

[149] 29 R. 163–64.

[150] 29 R. 164.

his shell casings and tossed them into the ditch.[151]  Compean explained "I just wasn't thinking.  I just—I just saw them, and picked them up"[152]  Further, Agent Compean admitted he did not report that he had fired his weapon when he saw Supervisory Agent Richards.[153]  Agent Compean testified, "I was afraid he wasn't going to believe me," as they did not have a suspect and there was "nobody to, I guess, corroborate what had happened or what had occurred."[154]

### 13.  Agent Ramos's Testimony

Movant testified that on February 17, 2005, he joined in the pursuit of a van.[155]  Although he suspected the van was involved with illegal drugs, he did not know whether the driver had committed a felony.[156]  When the van stopped before the river, he saw the driver jump out of the van and into the ditch.[157]  Movant drew his service weapon, and watched the driver "make a move" around Agent Compean.[158]  According to Movant, the driver's "move" was not a threatening gesture.[159]  In fact, Movant agreed he did not see the driver do anything threatening.[160]  Movant claimed that after the driver ran away, he moved through the ditch to

---

[151] 29 R. 165–66.

[152] 29 R. 165.

[153] 29 R. 168–69.

[154] *Id.*

[155] 29 R. 29.

[156] 28 R. 27, 32.

[157] 28 R. 184-85; 29 R. 41.

[158] 28 R. 189; 29 R. 52, 56.

[159] 29 R. 52-53.

[160] 29 R. 53.

assist Agent Compean, although he agreed that he was not concerned that the van driver would hurt anyone.[161] Movant claimed he heard shots while in the ditch, but did not hear any further shots after he emerged from the ditch.[162] Thus, he did not see Agent Compean shoot his weapon.[163] Although Movant was a former firearms instructor familiar with the sound of a service .40 caliber Baretta, he testified he could not tell if he heard a different weapon firing.[164] Movant said when he reached the top of the canal, he saw Agent Compean on the ground, and—thinking that Agent Compean might have been shot—ran past him and yelled for the driver to stop.[165] According to Movant, as the driver ran toward the river, he turned, and Movant saw a "shiny object" in his left hand.[166] He responded with one shot at the driver.[167] Movant said he did not see the driver go down.[168] Movant said he turned around and went back to Agent Compean to check on his condition.[169] Although Agent Compean acknowledged picking up shell casings as they walked back together, Movant testified that he did not see Agent Compean recover any casings.[170]

---

[161] 29 R. 54.

[162] 28 R. 206; 29 R. 62.

[163] 29 R. 62.

[164] 29 R. 5, 19, 63.

[165] 28 R. 207; 29 R. 68.

[166] 28 R. 208-09; 29 R. 72.

[167] *Id.*

[168] 28 R. 208–11.

[169] 28 R. 213.

[170] 29 R. 64.

Movant claimed he reported to his supervisors, but admitted he failed to mention that he had discharged his firearm.[171]  As a former firearms instructor, Movant acknowledged the incident was a "reportable shooting."[172]  He agreed that if he had reported the shooting, agents would have secured the scene, the sector evidence team would collected evidence, his firearm would have been taken from him, and a thick report would have been generated.[173]  When asked why he did not report the shooting, Movant testified, "I just messed up."[174]  Movant then asserted that he assumed someone else reported the shooting.[175]  He agreed, however, that if someone else had reported the shooting, his supervisor would have been asking him questions about the incident, which the supervisor never did.[176]

### 14. The Verdict and Sentence

After hearing the evidence, a unanimous jury rejected Movant's arguments and found him guilty of all the charged offenses except count one, assault with the intent to commit murder. The Court polled each juror individually, confirming the unanimity of the verdict.  The Court later sentenced Movant to imprisonment for twelve months and one day on each of counts two, three, eight, nine, and twelve, all to be served concurrently, and one hundred twenty months as to count four, to be served consecutively to the above counts; terms of supervised release for three years, all to be served concurrently; a fine of $2,000; and a special assessment of $600.  The

---

[171] 29 R. 82.

[172] 29 R. 84.

[173] 29 R. 82, 85–86, 106.

[174] 29 R. 82.

[175] 29 R. 83.

[176] *Id.*

lengthy aggregate sentence imposed on Movant—eleven years and a day—resulted from his conviction for discharging a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii).  Congress directed a mandatory minimum sentence of ten years for all defendants convicted under this statute.  Once the jury found Movant guilty of assault, the Court had no discretion but to impose at least a ten year sentence.  Thus, the sentence in this case reflected the mandatory ten year minimum for the violation of § 924(c), and one year and a day and two years, respectively, for the remaining convictions.

Movant filed a timely notice of appeal

## D.     The Appeal[177]

Movant raised fourteen points of error in his direct appeal.  He claimed the Court improperly precluded him from introducing relevant evidence concerning the value and amount of drugs discovered in the van and Aldrete's alleged drug-trafficking activities after the shooting incident.  Movant argued that barring him from presenting this evidence denied him his Sixth Amendment right to a complete defense.  Movant also challenged his conviction under the firearm statute, 18 U.S.C. § 924(c)(1)(A).  He raised both Due Process and Equal Protection challenges, while also claiming that the indictment was flawed in charging him with this crime.  He complained the Government produced evidence showing that he violated a number of Border Patrol policies in pursuing and firing upon Aldrete.  Movant characterized his trial as one in which the Government substituted Border Patrol policies for the actual crimes charged, and, by permitting evidence that established policies were violated and strict rules were broken, the Court had allowed the Government to avoid the more difficult task of showing that he had engaged in

---

[177] *United States v. Ramos*, 537 F.3d 439 (5th Cir. 2008).

criminal conduct.  Movant noted the indictment charged him under 18 U.S.C. § 1512(c) with tampering with an official proceeding by failing to report the shooting to his supervisors.  He argued on a number of grounds that such a failure to act constituted neither tampering with evidence nor inhibiting an official proceeding.  Finally, he repeatedly challenged the jury's verdict which rejected his version of the events.  He argued that—as a law enforcement officer—he was justified in shooting Aldrete because of the threat he thought Aldrete posed.  He further argued he was entitled to this justification defense even if he was reasonably mistaken in his perception of that threat.  He also argued that his rights in this respect were not adequately included in the jury instructions.  Movant's theory that he was justified in shooting Aldrete also animated his last argument.  He asserted that there was not sufficient evidence to convict him for the substantive criminal offense related to discharging his firearm precisely because he was acting in accord with his duties as a law enforcement officer.

The Fifth Circuit Court of Appeals held the Court's exclusion of the specific weight and size of the marijuana load in the van driven by Aldrete did not violate Movant's Sixth Amendment rights.  It noted the record showed Movant made specific arguments to the jury based on the large size of the load itself, and Aldrete's possible motives.  Thus, the specific weight and value of the marijuana load would have added little more to the case of the defense and reasonably could be seen as cumulative.  Further, the exclusion of evidence of Aldrete's alleged involvement in a subsequent drug-trafficking incident, based on his invocation of the Fifth Amendment, did not violate Movant's Sixth Amendment rights to confrontation.  The Court of Appeals explained Aldrete's immunity agreement was both facially and by nature not coextensive with the Fifth Amendment, and the Court, therefore, did not err in allowing Aldrete to assert his rights under the Fifth Amendment as to the subsequent drug-trafficking incident.

Moreover, the probative value of evidence of Aldrete's subsequent drug activity was substantially outweighed by the danger of unfair prejudice, confusion of the issues and misleading the jury, and by considerations of undue delay and waste of time. The Court of Appeals also held Movant had fair warning that the statute prohibiting the use of a firearm during and in relation to a crime of violence was applicable to him. It noted cases in the circuit—including *United States v. Williams*, 343 F.3d 423 (5th Cir. 2003), and *United States v. Winters* 105 F.3d 200 (5th Cir. 1997)—permitted the application of § 924(c)(1)(A) to police officers. Moreover, the indictment's use of the term "discharges" instead of the statutory word "uses" was sufficient to charge Movant with the crime of using or carrying a firearm in furtherance of a crime of violence. The Fifth Circuit agreed the Border Patrol's internal investigation of alleged employee misconduct by failing to follow the agency's established policies concerning firearms was not "an official proceeding" within the meaning of the statute prohibiting obstruction of justice. Finally, the Court of Appeals concluded the evidence was sufficient to support convictions for assault and violating Aldrete's civil rights. As the Fifth Circuit summarized:

> The defendants' argument here is one to which they repeatedly return: they were justified in firing upon Aldrete-Davila. But, once again, we must remind the defendants that the jury did not believe the defendants' testimony that Aldrete-Davila possessed an object in his hand. Aldrete-Davila's own testimony, the behavior of the defendants after the shooting, and the inconsistent testimony offered by both defendants and other Border Patrol agents allowed the jury to conclude that the defendants faced no credible threat and, consequently, there was no justification for their firing upon Aldrete-Davila. Although disputed, the evidence, taken in the light most favorable to the jury verdict, supports the scenario that Aldrete-Davila fled toward the Mexican border after Compean took a swing at him with his shotgun and that, while he was in flight, the defendants without provocation

fired their weapons at him several times.[178]

Accordingly, the Court of Appeals affirmed the convictions for counts one, two, three, four, and twelve. However, it reversed and vacated the convictions for counts eight and nine—obstruction of justice under § 1512(c)—because it concluded the Border Patrol investigation was not an "official proceeding" within the meaning of the statute. The Fifth Circuit then remanded the case for re-sentencing not inconsistent with this opinion.

The Fifth Circuit denied Movant's motion for rehearing on September 10, 2008. On November 13, 2008, the Court re-sentenced Movant to imprisonment for twelve months and one day on each of counts two, three, and twelve, all to be served concurrently, and one hundred twenty months as to count four, to be served consecutively to the above counts; terms of supervised release for three years, all to be served concurrently; a fine of $2,000; and a special assessment of $400. On January 19, 2009, President George W. Bush commuted the remaining portion of Movant's term of incarceration as to count four—discharging a firearm in relation to a crime of violence—effective March 20, 2009.

### E.    The Motion to Vacate, Set Aside, or Correct a Sentence

In his instant motion, Movant asserts five grounds for relief. First, he claims he was denied due process when the Government failed to disclose a report prepared by Special Agent Christopher Sanchez. Second, he asserts he was denied due process when the Government introduced the false testimony of Agent Vasquez during trial. Third, he maintains his counsel provided constitutionally ineffective assistance before and during his trial. Fourth, he avers he was denied due process by virtue of the Fifth Circuit Court of Appeals' failure to address the

---

[178] *Ramos*, 537 F.3d at 466.

prejudicial spillover from the vacated obstruction of justice counts.  Finally, he argues he was denied the right to a fair trial as a result of the cumulative errors committed during his trial.

## II.    LEGAL STANDARD

After a defendant has been convicted and exhausted or waived any right to appeal, a court is normally "entitled to presume that the defendant stands fairly and finally convicted."[179] Accordingly, "'[r]elief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice.'"[180]  Typically, before a court will grant relief pursuant to § 2255, the movant must establish that "(1) his sentence was imposed in violation of the Constitution or laws of the United States, (2) the sentencing court was without jurisdiction to impose the sentence, (3) the sentence was in excess of the maximum authorized by law, or (4) the sentence is otherwise subject to collateral attack."[181]

Ultimately, the movant bears the burden of establishing his claims of error by a preponderance of the evidence.[182]  A court may deny a § 2255 motion, however, if "the files and records of the case conclusively show that the prisoner is entitled to no relief."[183]  When a court

---

[179] *United States v. Willis*, 273 F.3d 592, 595 (5th Cir. 2001) (citing *United States v. Frady*, 456 U.S. 152, 164 (1982)).

[180] *United States v. Gaudet*, 81 F.3d 585, 589 (5th Cir. 1996) (quoting *United States v. Segler*, 37 F.3d 1131, 1133 (5th Cir. 1994)).

[181] *United States v. Seyfert*, 67 F.3d 544, 546 (5th Cir. 1995) (citations omitted).

[182] *Wright v. United States*, 624 F.2d 557, 558 (5th Cir. 1980).

[183] 28 U.S.C.A. § 2255(b) (West 2011); *see also United States v. Drummond*, 910 F.2d 284, 285 (5th Cir. 1990) ("Faced squarely with the question, we now confirm that § 2255 requires only conclusive evidence–and not necessarily direct evidence–that a defendant is entitled to no relief under § 2255 before the district court can deny the motion without a hearing.").

finds that the movant is entitled to relief, it "shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate."[184] Thus, the Court has "'broad and flexible power' . . . 'to fashion an appropriate remedy.'"[185]

Moreover, a collateral challenge to a conviction or sentence should not serve as a substitute for a direct appeal.[186] When raising issues of jurisdictional or constitutional magnitude for the first time in a motion seeking collateral relief, a movant must either (1) demonstrate "cause" for not raising the issue on direct appeal and "actual prejudice" resulting from the error, or (2) show that he is "actually innocent" of the crime for which he was convicted.[187] The cause-and-actual-prejudice standard is "significantly more rigorous than even the plain error standard . . . applied on direct appeal."[188] If the movant does not meet either burden, then he is procedurally barred from attacking his conviction or sentence.[189] This procedural bar does not apply, however, to claims which could not have been raised on direct appeal, such as those alleging ineffective

---

[184] 28 U.S.C.A. § 2255(b).

[185] *United States v. Stitt*, 552 F.3d 345, 355 (4th Cir. 2008) (quoting *United States v. Hillary*, 106 F.3d 1170, 1171 (4th Cir. 1997); *see also Andrews v. United States*, 373 U.S. 334, 339 (1963) ("[T]he provisions of the statute make clear that in appropriate cases a § 2255 proceeding can also be utilized to provide a . . . flexible remedy."); *United States v. Torres-Otero*, 232 F.3d 24, 30 (1st Cir. 2000) ("As an initial matter, we note the broad leeway traditionally afforded district courts in the exercise of their § 2255 authority. . . . This is so because a district court's power under § 2255 'is derived from the equitable nature of habeas corpus relief.'") (quoting *United States v. Handa*, 122 F.3d 690, 691 (9th Cir. 1997)).

[186] *Frady*, 456 U.S. at 165; *United States v. Shaid*, 937 F.2d 228, 231 (5th Cir. 1991).

[187] *United States v. Torres*, 163 F.3d 909, 911 (5th Cir. 1999).

[188] *Gaudet*, 81 F.3d at 589.

[189] *United States v. Drobny*, 955 F.2d 990, 994–95 (5th Cir. 1992).

assistance of counsel.[190]

With these principles in mind, the Court turns to the merits of Movant's claims.

## III. ANALYSIS

### A. Failure to Disclose Report by Special Agent Christopher Sanchez

#### 1. The Claim

Movant maintains the Government failed to provide the defense with a copy of Special Agent Christopher Sanchez's April 12, 2005, report on the shooting incident, as required by *Brady v. Maryland*[191] or the Jencks Act.[192] *Brady* requires the Government, pursuant to the due process clause, to disclose to the defense evidence that is favorable to the accused and material to his guilt.[193] Such evidence includes impeachment evidence.[194] The Jencks Act requires that the Government disclose prior recorded witness statements in its possession relating to the subject matter of that witness's testimony.[195]

Special Agent Christopher Sanchez's report says in relevant part:

Investigation disclosed that the following [Border Patrol] agents were at the

---

[190] *See United States v. Pierce*, 959 F.2d 1297, 1301 (5th Cir. 1992) (stating that the general rule in the Fifth Circuit is that, except in rare instances where the record on direct appeal is adequate to evaluate such a challenge, an ineffective assistance of counsel claim cannot be resolved on direct appeal because no opportunity existed for the parties to develop the record on the merits of the allegations).

[191] 373 U.S. 83 (1963).

[192] 18 U.S.C.A. § 3500 (West 2011).

[193] *United States v. Bailey*, 473 U.S. 667, 674 (1985).

[194] *Id.* at 676.

[195] 18 U.S.C.A. § 3500.

location of the shooting incident, assisted in destroying evidence of the shooting, and/or knew/heard about the shooting: Oscar Juarez; Arturo Vasquez; Jose Mendoza; David Jaquez; Lance Medrano; Lorenzo Yrigoyen; Rene Mendez; Robert Arnold; and Jonathan Richards.

Investigation disclosed that none of the above agents, to include Compean and Ramos, reported the shooting or the subsequent cover up when Compean and Vasquez picked up the expended brass cartridges (i.e., evidence of the shooting) and threw them away.[196]

Movant asserts his counsel first saw the report long after his trial concluded. He argues this evidence contradicted and rebutted the Government's theory of the case—which the prosecutors argued at length to the jury—that Movant's failure to report the shooting to his supervisors could only have been motivated by his knowledge of his own guilt. He continues that if his supervisors, Supervisory Agents Richards and Arnold, knew of the shooting—or even if Movant was justified in assuming they knew about it—then the Government's strongest argument for his guilt would have been severely undercut, if not eliminated altogether.

### 2.    Procedural Default

"Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice."[197]  Accordingly, "[a] defendant . . . may not raise an issue for the first time on collateral review without showing both "cause" for his procedural default, and "actual prejudice" resulting from the error."[198]  To establish "cause," a

---

[196] Mot. to Vacate 21.

[197] *United States v. Vaughn*, 955 F.2d 367, 368 (5th Cir. 1992) (per curiam) (citations omitted).

[198] *Shaid*, 937 F.2d at 232.

defendant must show some external impediment prevented him from raising the claim on direct appeal.[199] In order to meet the "actual prejudice" test, he must demonstrate not just the possibility of prejudice, "but an actual and substantial disadvantage, infecting his entire trial with error of constitutional dimension."[200]

Movant's trial co-counsel, Stephen Peters ("Peters"), states in an affidavit:

> On February 8, 2007, I became aware through a news media report of a memorandum dated April 12, 2005. A copy of the memorandum, which I retrieved on February 8, 2007, over the Internet from the news outfit that reported it, namely, World Net Daily. Com, and a copy of which I attach to this Affidavit, contains the following two paragraphs, set forth herein verbatim [quoting the above paragraphs] . . .[201]

Movant filed his appellate brief for his direct appeal to the Fifth Circuit on May 21, 2007.[202] This filing occurred more than three months after Peters read the report on the Internet. Thus, by either consulting with Peters or examining Internet news reports, Movant's appellate counsel could have known of Special Agent Christopher Sanchez's report months before he filed Movant's appellate brief. Movant could have raised the *Brady* and Jencks issues—the same issues he raised in his § 2255 motion—in his direct appeal.

Movant counters the Fifth Circuit notified his appellate counsel by e-mail on February 22, 2007, "that the appellate record was available to be 'checked out' from the Fifth Circuit" and his

---

[199] *United States v. Flores*, 981 F.2d 231, 235 (5th Cir. 1993).

[200] *Shaid*, 937 F.2d at 233.

[201] *Id.* Ex. 1 (Aff. of Stephen G. Peters).

[202] *See* Fifth Circuit docket sheet No. 06-51489 (Appellant's Brief filed by Appellant Ignacio Ramos, filed May 21, 2007).

appellate counsel "did not discover that trial counsel had learned of the suppressed report until after the Fifth Circuit had finalized Ramos'[s] direct appeal."[203]  Moreover, Movant claims he could not have supplemented the record, and the Government's threshold argument is without merit.  Accordingly, the Court finds Movant may have had cause for not raising the issue on direct appeal, and will address the merits of his claims.

### 3.    Legal Standard

Few constitutional principles are more firmly established than the rule that "'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'"[204]  The prosecution's duty to disclose evidence material to either guilt or punishment—the rule announced in *Brady*—applies even when the accused has not requested the evidence.[205]  Under clearly established Supreme Court precedent, there are three elements to a *Brady* claim: (1) the evidence must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be "material."[206]  Evidence is "material" under *Brady* where there exists a "reasonable probability" that had the evidence been disclosed the result at trial would have been different.[207]

---

[203] Movant's Reply 7.

[204] *Banks v. Dretke*, 540 U.S. 668, 691 (2004).

[205] *Id.* at 690; *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *United States v. Agurs*, 427 U.S. 97, 107 (1976).

[206] *Banks*, 540 U.S. at 691; *Strickler v. Greene*, 527 U.S. at 281–82.

[207] *Banks*, 540 U.S. at 698–99

The Jencks Act requires the Government to disclose prior recorded witness statements in its possession relating to the subject matter of that witness's testimony.[208] "Unless a nondisclosure was harmless error, reversal is required even where the prosecution has acted in good faith."[209]  Thus, the failure to produce Jencks Act material is subject to harmless error analysis.[210]  The reviewing court must "determine whether the error itself had a substantial influence on the judgment in addition to determining whether there was sufficient evidence to support the conviction."[211]

###    4.    The Merits

Contrary to Movant's claim, the first paragraph of Special Agent Sanchez's report does not clearly assert that Movant's supervisors—Supervisory Agents Arnold and Richards—knew of the shooting incident.  The first paragraph uses the term "and/or."  "Bryan A. Garner reports in *A Dictionary of Modern Legal Usage* 56 (2d ed.1995), that . . . the expression, while 'undeniably clumsy, does have a specific meaning ( x and/or y = x or y or both).'"[212]  Based on the "and/or" language, it merely indicates Supervisory Agents Arnold and Richards were at the location of the shooting incident, and/or assisted in destroying evidence, and/or knew about the shooting. Further, the second paragraph of the report establishes that "none" of the agents reported the shooting.  Supervisory Agent Richards testified he first learned of shooting  when he was

---

[208] 18 U.S.C.A. § 3500.

[209] *United States v. McKenzie*, 768 F.2d 602, 609 (5th Cir. 1985).

[210] *United States v. Montgomery*, 210 F.3d 446, 451 (5th Cir. 2000).

[211] *Id.*

[212] *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 463 (7th Cir. 2001).

interviewed by Special Agent Chris Sanchez on March 23, 2005.[213]  Supervisory Agent Arnold testified the first time he was informed that a firearm had been discharged was in March.[214] Thus, Supervisory Agents Arnold and Richards, who clearly arrived after the shooting, did not receive a report of the shooting and did not know or hear about the shooting.  This testimony was consistent with one of the disjunctive propositions in the first paragraph of the report—being present at the location of the shooting incident—and the proposition of the second paragraph—that "none" of the agents reported the shooting.  Further, Agent Compean admitted he did not report that he had fired his weapon when he saw Supervisory Agent Richards.[215] Agent Compean testified, "I was afraid he wasn't going to believe me," as they did not have a suspect and there was "nobody to, I guess, corroborate what had happened or what had occurred."[216]  Moreover, Movant claimed he reported to his supervisors after the incident, but admitted he failed to mention that he had discharged his firearm.[217]  As a former firearms instructor, Movant acknowledged the incident was a "reportable shooting."[218]  He agreed that if he had reported the shooting, agents would have secured the scene, the sector evidence team would have collected evidence, his firearm would have been taken from him, and a thick report would have been generated.[219]  When asked why he did not report the shooting, Movant testified,

---

[213] 26 R. 239–41.

[214] 27 R. 77.

[215] 29 R. 168–69.

[216] *Id.*

[217] 29 R. 82.

[218] 29 R. 84.

[219] 29 R. 82, 85–86, 106.

"I just messed up."[220]  Movant then asserted that he assumed someone else reported the shooting.[221]  He agreed, however, that if someone else had reported the shooting, his supervisor would have been asking him questions about the incident, which he never did.[222]

Movant is not entitled to relief on his claim that the Government failed to provide the defense with a copy of Special Agent Christopher Sanchez's April 12, 2005. As previously stated, Contrary to Movant's claim, the first paragraph of Special Agent Sanchez's report does not clearly assert that Movant's supervisor knew of the shooting.  Furthermore, the information contained in the Sanchez report was not favorable to Movant, did not provide any basis for impeachment, and there is not a reasonable probability that—had the evidence been disclosed—the result at trial would have been different.  Moreover, there was substantial evidence to support the conviction.  Thus, Movant's argument fails under *Brady*.

**B.      False Testimony of Agent Arturo Vasquez**

**1.      The Claim**

Movant asserts the prosecution's creation of and knowing elicitation of false testimony by Agent Vasquez denied Movant his due process rights.  He explains Agent Vasquez testified for the Government.  On direct examination, Agent Vasquez claimed that on February 17, 2005, he heard "radio traffic from Agent Compean that there was a van traveling north . . . at a high rate of speed."[223]  The prosecutor did not ask whether Agent Vasquez had heard Agent Compean

---

[220] 29 R. 82.

[221] 29 R. 83.

[222] *Id.*

[223] Mot. to Vacate 25 (quoting 2 S.R. #185).

-39-

broadcast "10-46," a code indicating Agent Compean suspected the van was involved in

narcotics trafficking.  On cross-examination, Movant' counsel asked Agent Vasquez if he

recalled a broadcast that a 10-46 was in process.  Vasquez first said that Agent Compean had not

called out a 10-46.  When confronted with his prior statement, dated March 18, 2005, however,

Agent Vasquez admitted that his statement, given to Special Agent Christopher Sanchez, did in

fact reflect that he had heard a 10-46 broadcast by Agent Compean.  He explained that he had

gone back and listened to the agency tapes of the radio traffic before the trial, but the 10-46 call

was not on the tapes.  Accordingly, Vasquez testified at trial that his statement of March 18,

2005, was inaccurate regarding the 10-46 call.  The Government stood silent during the

cross-examination of Agent Vasquez about the 10-46 broadcast.

In testimony given at an arbitration hearing on September 16, 2008, Agent Vasquez

testified that a prosecutor coached him not to claim he heard a "possible 10-46 in progress"

because it was not recorded on agency tapes.  Agent Vasquez then said he stood by his March 18,

2005, statement that he heard a "possible 10-46 in progress" on February 17, 2005.

Movant argues the Government undermined his defense with Agent Vasquez's "false"

testimony, as he believes this information was critical  to the facts surrounding the

reasonableness of his shooting Aldrete:

> The broadcast of a 10-46 creates reasonable suspicion (in the legal sense) and
> then coupled with the failure of the van to stop and the actions of the van in
> attempting to elude being stopped by Ramos and other agents, equate with
> probable cause to believe a felony was being committed.  Probable cause to
> believe a felon was attempting to elude being stopped would add to the
> totality of the facts surrounding the reasonableness of Ramos and Compean's
> actions on the day in question.

*...*...*...*...*

By ensuring that Vasquez did not acknowledge the 10-46 which they knew he had in fact heard, the Government undermined Ramos'[s] defense by inferentially allowing the testimony of Compean and Ramos to go uncorroborated by any other agent involved in the events of February 17, 2005."[224]

## 2.    Legal Standard

Due process is violated when the Government knowingly elicits, or fails to correct, materially false statements from its witnesses.[225]  To merit relief on this basis, a movant must show (1) the statements at issue are actually false, (2) the prosecution knew the statements were false, and (3) the statements were material.[226]  The falseness of testimony is not, however, established simply by pointing to contradictory testimony from witnesses, inconsistencies within a witness's testimony, or a conflict between reports, written statements and the trial testimony of witnesses.  Such matters simply go to the credibility of the witness.[227]

Additionally, prosecutorial misconduct may constitute a denial of due process if the trial

---

[224] *Id.* 29, 31–32.

[225] *United States v. Martinez-Mercado*, 888 F.2d 1484, 1492 (5th Cir. 1989).

[226] *Kutzner v. Johnson*, 242 F.3d 605, 609 (5th Cir. 2001); *United States v. Haese*, 162 F.3d 359, 365 (5th Cir. 1998).

[227] *See Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990) ("Such contradictory trial testimony, however, merely establishes a credibility question for the jury."); *Martinez-Mercado*, 888 F.2d at 1492 ("The omission of certain facts from the reports and written statements of the prosecution's witnesses, alone, is certainly not adequate to put the prosecution on notice of perjury on their part, much less to establish that such perjury in fact occurred."); *United States v. Viera*, 819 F.2d 498, 502 (5th Cir. 1987) ("Appellant's counsel was certainly free to investigate the inconsistencies between King's pre-trial and his in-trial testimony.  Absent a belief that his witness was perjuring himself, however, the prosecution was not obliged to make the defense counsel's credibility arguments for him.").

was rendered fundamentally unfair as a result.[228]  A trial is fundamentally unfair if there is a reasonable probability the verdict might have been different had the trial been properly conducted.[229]

### 3.    The Merits

As noted above, before a court will grant relief on the basis of the prosecution knowingly using false evidence or perjured testimony, the movant must first prove the contested statements were actually false.[230]  Agent Vasquez's testimony on direct and cross examination established that he made a written statement saying he believed he had heard Agent Compean broadcast a possible 10-46 in progress on February 17, 2005.  After listening to the agency tapes at the request of the prosecutor, however, he noted the 10-46 call was not recorded, and he thought he may have been mistaken.  Nevertheless, based on Agent Compean's call—and based on the notorious nature of the area from which the van was observed leaving at high speed—Agent Vasquez left his post to help Agent Compean chase a van which Agent Vasquez suspected was carrying drugs.  Mere inconsistencies between a witness' trial testimony and his prior statements do not in themselves establish that the testimony is false; such inconsistencies "can as easily be

---

[228] *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986) ("The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'  Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'") (citations omitted); *Ables v. Scott*, 73 F.3d 591, 592 n. 2 (5th Cir. 1996) ("In habeas corpus proceedings, we review allegedly improper prosecutorial statements made during a state trial to determine whether they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'").

[229] *Styron v. Johnson*, 262 F.3d 438, 454 (5th Cir. 2001); *Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000).

[230] *Kutzner*, 242 F.3d at 609.

explained as the result of faulty recollections."[231]  Therefore, in this case, there is no proof that Agent Vasquez's testimony was actually false.

The next element the movant must establish is that the alleged false statement was material.  Perjured testimony is material "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."[232]  According to Movant, whether Agent Compean broadcasted a possible 10-46 in progress was important because such a report, if issued, would have afforded him knowledge of a suspected narcotics transaction which, in turn, would have supported his use of deadly force.  This contention is meritless for two reasons.  First, as the Fifth Circuit explained in its opinion on Movant's direct appeal, the reasons for the vehicle chase were not significantly relevant to the question of whether it was objectively reasonable for Movant to shoot Aldrete while he was running away, on foot, toward Mexico.[233]  Further, the record contained plenty of evidence of the large load of marijuana Aldrete carried in the van.  Thus, Movant was free to argue—and did argue—that the jury should consider Aldrete's motives to flee, to protect his investment, and to avoid prosecution for his crime, in determining the issue of whether Aldrete likely possessed and brandished a gun, thereby justifying Movant's use of deadly force.  Thus, Movant has failed to establish the materiality element since he has not established any reasonable likelihood that testimony regarding a 10-46 call could have affected the judgment of the jury.

---

[231] *Washington*, 44 F.3d at 1282.

[232] *Creel v. Johnson*, 162 F.3d 385, 391 (5th Cir.1998) (citations and internal quotation marks omitted).

[233] *Ramos*, 537 F.3d at 456 n.12 ("A suspect who poses no physical threat while fleeing to reach the Mexican border does not present the tense situation and uncertainty that justifies the use of deadly force.  This point was resolved by the jury against the agents.").

Finally, as to the third element, due process is not implicated by the prosecution's introduction or allowance of false or perjured testimony unless the prosecution actually knew or believed the testimony was false or perjured; it is not enough that the testimony was challenged by another witness or was inconsistent with prior statements.[234]  Movant has failed to establish that the prosecution knew that Agent Vasquez 's testimony that he may have been mistaken as to hearing a 10-46 call was false.  First, the fact that a 10-46 call was not recorded means either that Agent Compean did not include the code in his transmission or he used the code while his transmitter remained in local mode.  In any event, because it was not recorded, the existence of a 10-46 call by Agent Compean cannot be definitively demonstrated by objective evidence.  Moreover, Supervisory Agent Richards testified that Agent Compean reported he saw a vehicle leaving at a high rare of speed, not that Agent Compean broadcast a possible 10-46 in progress call.  More significantly, Agent Compean failed to state in his Report Of Apprehension Or Seizure—executed only hours after the event—that he had made a 10-46 call, casting doubt as to his memory or his veracity.  Movant has not established that Agent Vasquez heard a possible 10-46 call.  Accordingly, Movant cannot establish the prosecution knew that Agent Vasquez's testimony was false.

Movant has failed to demonstrate that (1) the contested statements were actually false, (2) that they were material, and (3) that the prosecution knew of the falsity.  He is not entitled to relief on this claim.

---

[234] *Kutzner*, 242 F.3d at 609; *Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990); *United States v. Sutherland*, 656 F.2d 1181, 1203 (5th Cir. 1981).

## C.    Ineffective Assistance of Counsel

### 1.    The Claims

Movant alleges ten instances he believes constitute constitutionally ineffective assistance

of his trial counsel:

- Agent Ramos's trial counsel rendered deficient, prejudicial performance by failing to conduct appropriate legal research and file a motion to dismiss the obstruction of justice counts.

- Agent Ramos's trial counsel rendered deficient, prejudicial performance by failing to conduct appropriate legal research and file a motion to dismiss counts one to four and twelve—the non-obstruction of justice counts.

  - Research would have revealed a meritorious motion regarding Davila's connections with the United States sufficient to deny him any Fourth Amendment protections, thereby justifying dismissal of all of the non-obstruction of justice counts.

  - Research would have revealed a meritorious motion that 18 U.S.C. § 242, as applied to Agent Ramos, violated Ramos's Fifth Amendment rights to fair warning even assuming, for purposes of the motion, that Davila did not in fact have a gun in his hand when he turned around towards Agent Ramos.

- Agent Ramos's trial counsel rendered deficient, prejudicial performance by failing to conduct appropriate legal research and file a motion to dismiss count four of the indictment.

- Agent Ramos's trial counsel rendered deficient, prejudicial performance by failing to conduct appropriate legal and factual research regarding the jurisdictional element of counts one, two, and three, and by failing to subject the Government's evidence relating to the jurisdictional element to meaningful adversary testing.

- Ramos's Trial Counsel rendered deficient, prejudicial performance by failing to call an expert witness on the use of force.

- Ramos's Trial Counsel rendered deficient, prejudicial performance by failing to conduct appropriate legal research, request a substantially correct jury instruction on Ramos's theory of defense and by failing to object to the Court's instructions to the jury on the ground that it did not contain a theory of defense instruction.

- Ramos's Trial Counsel rendered deficient, prejudicial performance by

failing to conduct appropriate legal research, request a substantially correct jury instruction on self-defense that included apparent danger, and object to the Court's instruction to the jury on the ground that the self-defense instruction failed to include apparent danger.

- Ramos's Trial Counsel rendered deficient, prejudicial performance by failing to conduct appropriate legal research, request substantially correct jury instructions on the use of force and object to the Court's instructions to the jury on the ground that it was inaccurate and insufficient.

- Ramos's Trial Counsel rendered deficient, prejudicial performance by failing to request appropriate limiting instructions regarding the violations of four Border Patrol policies and object to the Court's instructions to the jury due to the absence of appropriate limiting instructions.

- Ramos's Trial Counsel rendered deficient, prejudicial performance by failing to object to the Government's improper jury arguments.

## 2. Legal Standard

The United States Constitution's Sixth Amendment guarantees an accused the right to the assistance of counsel for his defense in all criminal prosecutions.[235]  Moreover, "the right to counsel is the right to the effective assistance of counsel."[236]  "[I]neffective assistance claims are ordinarily brought for the first time on collateral review because of the difficulty of compiling an adequate record by the time of direct appeal."[237]  To merit relief on an ineffective assistance of counsel claim, a movant must demonstrate both (1) that his "counsel's performance was deficient," and (2) that "the deficient performance prejudiced the defense."[238]  A failure to

---

[235] U.S. Const. amend. VI.

[236] *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970).

[237] *Gaudet*, 81 F.3d at 589 n.5.

[238] *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir. 1994) (summarizing the *Strickland* standard of review).

-46-

establish either prong of this test requires a finding that counsel's performance was constitutionally effective.[239]

The test's performance prong centers on whether counsel's assistance was reasonable, considering all the circumstances at the time of counsel's conduct.[240]  In order to obtain relief, a movant must establish "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."[241]  In assessing whether a particular counsel's performance was constitutionally deficient, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"[242]  A deficiency in counsel's performance, even if professionally unreasonable, does not equal ineffective assistance of counsel; the movant must also demonstrate actual prejudice.[243]  The test's prejudice prong requires the movant to "show that there is a reasonable probability that, but for counsel's

---

[239] *See Strickland*, 466 U.S. at 687 ("Unless a defendant makes both showings, it cannot be said that the conviction or . . . sentence resulted from a breakdown in the adversary process that renders the result unreliable."); *Carter v. Johnson*, 131 F.3d 452, 463 (5th Cir. 1997) ("Failure to prove either deficient performance or actual prejudice is fatal to an ineffective assistance claim."); *Armstead v. Scott*, 37 F.3d 202, 210 (5th Cir. 1994) ("A court need not address both components of the inquiry if the defendant makes an insufficient showing on one.").

[240] *See Strickland*, 466 U.S. at 688 ("The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.").

[241] *Id*. at 687.

[242] *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

[243] *See id*. at 691-92 ("The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution.").

unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[244]

### 3. Failure to File a Motion to Dismiss Obstruction of Justice Counts

Movant claims his trial counsel provided constitutionally ineffective assistance by failing to file a motion to dismiss the two obstruction of justice counts: (1) count eight charging him with tampering with an official proceeding by obstructing and impeding a contemporaneous investigation surrounding the shooting, in violation of 18 U.S.C. § 1512(c)(2); and (2) count nine charging him with tampering with an official proceeding by failing to report, contrary to his affirmative duty, the discharge of his agency firearm, in violation of 18 U.S.C. § 1512(c)(1). He notes the Fifth Circuit reversed the obstruction of justice convictions, ruling that the Border Patrol's "internal informal investigation, in its most preliminary stages, of employee violations of an agency policy is not an 'official proceeding' within the meaning of § 1512(c)."[245] The Fifth Circuit cited little in the way of controlling authority. It reached its conclusion on the basis of the statutory language. Additionally, the Fifth Circuit noted that it did "not address whether an agency investigation may never constitute an "official proceeding."[246] Thus, at the time of trial, there was a lack of directly controlling authority, and challenging the two obstruction counts was not an obvious avenue of attack.[247] Counsels' "failure to divine" change in unsettled law did not

---

[244] *Id*. at 694.

[245] *Ramos*, 537 F.3d at 463.

[246] *Id*. at 464 n.18.

[247] *See, e.g., United States v. Perez*, 575 F.3d 164 (2nd Cir. 2009) (holding defendant's false statements during a use of force investigation by the Bureau of prisons were made during an "official proceeding,"as used in 18 U.S.C. § 1512.).

constitute ineffective assistance.[248]

Movant maintains that if his trial counsel had been successful in dismissing the obstruction counts, the evidence of his violations of Border Patrol policies would not have been admissible, and, free from the "spillover prejudice," he speculates that the jury's verdict would have been different. The referenced policies covered such matters as high-speed pursuits, reporting firearm discharges, preserving evidence, and the use of deadly force. The Court admitted this evidence as relevant to intent and knowledge of wrong-doing relating to Movant's crimes, and it repeatedly admonished the jury that it was only to consider guilt in terms of the crimes actually charged in the indictment.[249] Admittedly, evidence of Movant's failure to report the shooting within one hour pursuant to Border Patrol policy—and his failure to ever report the shooting—were perhaps the strongest evidence of his guilty knowledge of the assault, and was very strong evidence of the lack of reasonable belief that Aldrete posed an immediate threat of serious physical harm to Movant or others. However, this evidence—and other evidence of the violations of policies that aided in hiding and covering up Movant's offenses—was admissible in a trial with or without the obstruction counts.[250]

The phrase "spillover prejudice" stems from a claim that a district court abused its

---

[248] *Sullivan v. Wainwright*, 695 F.2d 1306, 1309 (11th Cir. 1983).

[249] *See United States v. Butler*, 429 F.3d 140, 150 (5th Cir. 2005) ("In sum, because the . . . policies were admitted for the limited purpose of establishing criminal intent on the part of Butler, and because the district court issued a comprehensive limiting instruction further clarifying the purpose of that evidence, we find no reversible error."); *United States v. Cordell*, 912 F.2d 769, 777 (5th Cir. 1990) ("Regulation J was used only to show that responsibility for the funds had shifted to ANB and that Cordell therefore misapplied bank funds by reversing the checks. Neither Regulation J nor any other civil regulation was referred to in the instructions to the jury. Moreover, the trial court's admonitions to the jury regarding § 84 violations likely prevented any possible bootstrapping of this conviction.").

[250] *Id*.

discretion in denying a motion for severance.[251]  "[T]o be entitled to reversal in this context 'the defendant must show that: (1) the joint trial prejudiced him to such an extent that the district court could not provide adequate protection; and (2) the prejudice outweighed the government's interest in economy of judicial administration.'"[252]  At a minimum, the defendant must show that he experienced some prejudice as a result of the joinder of invalid claims.[253]  In other words, the defendant must show that otherwise *inadmissible* evidence was admitted to prove the invalid counts.  As discussed above, the evidence of Movant's policy violations was admissible with or without the obstruction counts.  Moreover, where, as here, the jury is instructed of separate crimes being charged against each defendant—and that the jury must consider each count and the evidence pertaining to it separately—the instruction effectively cures any risk of spillover prejudice.[254]

Finally, Movant raised a related issue in his direct appeal, arguing that evidence showing he violated a number of Border Patrol policies in pursuing and firing upon Aldrete produced a trial in which the policies were substituted for the actual crimes charged.  By so doing, according to Movant, the Court allowed the Government to avoid the more difficult task of showing that he had engaged in criminal conduct.  The Fifth Circuit rejected this proposition.[255]

Before trial, the district court explicitly prohibited the government from

_____

[251] *United States v. Edwards*, 303 F.3d 606, 639-40 (5th Cir. 2002).

[252] *Id*. (quoting *United States v. Pofahl*, 990 F.2d 1456, 1483 (5th Cir. 1993) (noting in this context that "the mere presence of a spillover effect does not ordinarily warrant severance")).

[253] *Id*.

[254] *United States v. Morrow*, 177 F.3d 272, 290 (5th Cir. 1999).

[255] *Ramos*, 537 F.3d at 459–60.

> making any statement implying that violation of Border Patrol policies could be considered illegal. And at trial, the government never suggested that violation of one of the policies was sufficient for conviction. Instead, the government only used the policies as evidence of the state of mind of the defendants for crimes of violence, which had no dependency on the policies for their definition, essence, or viability.[256]

Thus, Movant was "properly convicted of substantive crimes, not for violating Border Patrol policies."[257] Movant cannot now ask the Court, or another panel of the Fifth Circuit, to change this determination.

Movant cannot meet his prejudice burden of demonstrating there would have been a different trial outcome had the Court dismissed the obstruction counts prior to trial. This claim as to constitutionally ineffective assistance of counsel is without merit.

### 4. Failure to File a Motion to Dismiss the Non-Obstruction Counts

### a. Aldrete Had Fourth Amendment Rights

Movant contends he received constitutionally ineffective assistance of counsel because trial counsel did not file a motion to dismiss count four, the civil rights count, based on the theory that Aldrete did not possess the Fourth Amendment right to be free from illegal seizures and the right not to be assaulted because he lacked connections with the United States. He explains that in *United States v. Verdugo-Urquidez*,[258] the Supreme Court held the Fourth Amendment did not apply to a search by United States agents of the home of a Mexican resident in Mexico. In reaching this conclusion, the Court focused on both the extraterritoriality of the search and the

---

[256] *Ramos*, 537 F.3d at 460.

[257] *Id*. at 466.

[258] 494 U.S. 259 (1990).

nature of the defendant's relationship to the United States.[259]  Movant's  claim relies on language from Chief Justice Rehnquist's opinion defining "the people" protected by the Fourth Amendment as individuals present in the United States voluntarily who had accepted some societal obligations or developed substantial connections with this country.  He asserts Aldrete—a Mexican citizen in the United States illegally—was not among "the people," and, therefore, not entitled to Forth Amendment protections.

A majority of the justices voiced disagreement with the analysis of "the people" advanced by Chief Justice Rehnquist.  Justice Kennedy, in his separate concurrence, expressly rejected the idea that the opinion provides any authority for restricting the category of persons protected by the Fourth Amendment.[260]  Justice Kennedy added that if the search had been conducted in a residence within the United States, he had "little doubt that the full protections of the Fourth Amendment would apply."[261]  Thus, Justice Kennedy appears to have placed dispositive weight on the extraterritoriality aspect of that case.  It does not appear, therefore, that there were actually five votes for the proposition that some individuals within the territory of the United States might not be protected by the Fourth Amendment.

Furthermore, in *Martinez-Aguero v.Gonzalez*[262]—a case where the plaintiff claimed that defendant's conduct constituted assault, battery, and false arrest, based on an altercation at the Paso del Norte International Bridge, in El Paso, Texas—this Court denied Defendant Border

---

[259] *Id.* at 261.

[260] *Id.* at 276 (Kennedy, J., concurring).

[261] *Id.* at 278.

[262] EP-03-CA-411-KC, 2005 WL 388589 (W.D. Tex. 2005).

Patrol Agent Gonzalez's ("Agent Gonzalez") motion for summary judgment on his defense of qualified immunity. One of Agent Gonzalez's assertions was that—based on *Verdugo-Urquidez*—the plaintiff had no Fourth Amendment rights as an alien who had not yet been admitted into the United States.[263] In a detailed analysis of the *Verdugo-Urquidez* opinion, this Court noted the Supreme Court's decision did not involve the Fourth Amendment rights of those aliens physically located either legally or illegally within United States territory, and as such, the facts of the decision alone limited its potential relevancy. Moreover, the definition of "the people" for purposes of applying the Fourth Amendment was not necessarily binding authority.[264] This Court explained that the history deemed relevant in *Verdugo-Urquidez* focused on the purpose of the Fourth Amendment in restricting searches in domestic matters and whether the Fourth Amendment was ever intended to apply to "aliens in foreign territory or in international waters."[265] The emphasis of the *Verdugo-Urquidez* "decision therefore can be read as less of an intent to set forth a universally applicable definition of who may properly be characterized as 'the people,' and more an attempt to strike a balance between the sovereign power of the United States to address matters international in character . . . while at the same time not completely discounting the extra-territorial application of the Fourth Amendment."[266] Thus, "[r]ead in that limited context, the definition of "the people" set forth in *Verdugo-Urquidez*

---

[263] *Id.* at *4.

[264] *Id.* at *5–6.

[265] *Id*. at *21.

[266] *Id*. at *21 (citations and quotations omitted).

does not appear to be excessively limiting in scope."[267]  On August 4, 2006—months after Movant's trial—the Fifth Circuit affirmed this Court's opinion, holding that aliens stopped at the border have a constitutional right to be free from false imprisonment and the use of excessive force by law enforcement personnel.[268]

At the time of Movant' trial, sixteen years after *Verdugo-Urquidez*, neither the Supreme Court nor any circuit court had held that an alien—found within the United States, but without sufficient societal obligations or substantial connections with this country—lacked the Fourth Amendment right to be free from unreasonable seizure.  Accordingly, the Court would have denied a motion to dismiss the non-obstruction counts based on *Verdugo-Urquidez*.  Counsel cannot be considered ineffective for failing to file a meritless motion.[269]

### b.     Agent Ramos Had Fair Warning

Movant next contends that he received constitutionally ineffective assistance because his trial counsel did not file a motion to dismiss the non-obstruction counts on the basis that there was "no case remotely on point that would have afforded Ramos 'fair warning' that his 'use of deadly force' was clearly unreasonable and therefore, within the purview of 18 U.S.C. § 242."[270]

---

[267] *Id*. at *29.

[268] *Martinez-Aguero v.Gonzalez*, 459 F.3d 618 (5th Cir. 2006).

[269] *See United States v. Gibson*, 55 F.3d 173, 179 (5th Cir. 1995) ("Counsel is not required by the Sixth Amendment to file meritless motions."); *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument . . . cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue."); *Sones v. Hargett*, 61 F.3d 410, 415 n. 5 (5th Cir. 1995) ("Counsel cannot be deficient for failing to press a frivolous point.").

[270] Mot. to Vacate 62.

Movant's arguments are based on his version of the facts surrounding the shooting which the jury completely rejected. As the Fifth Circuit repeatedly noted, the case simply turned on a different versions of facts.[271]

Moreover, Movant raised the same "lack of fair warning" issue in his direct appeal. The Fifth Circuit entirely rejected his argument. It determined "[t]here is little question that Ramos was on notice that shooting an individual who posed no threat was a violation of a constitutional right."[272] Accordingly, it was not deficient performance for Movant's trial counsel not to raise this issue. Moreover, since the Fifth Circuit found no error or prejudice to Movant's substantial rights, there was no prejudice here. Movant is not entitled to relief on this claim.

### 5. Failure to File a Motion to Dismiss the Discharging a Firearm Count

Movant also asserts that his trial counsel was ineffective for failing to move to dismiss count four of the indictment which alleged he discharged a firearm in commission of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A). He argues his indictment was defective because he should have been charged with "using" a firearm instead of "discharging" a firearm, where discharge is a factor affecting a sentence.[273] Movant raised this same argument in his direct appeal and cited the same cases before the appellate court that he cites here. The Fifth Circuit, however, found no error or plain error in the language of count four.

Here, the term "discharge" is but a specific manner of use of the broad term

---

[271] *See, e.g., Ramos*, 537 F.3d at 456 ("Whether the defendants were justified in shooting Aldrete-Davila is an issue no longer in play after the jury verdict that rejected the defendants' versions of the facts.").

[272] *Ramos*, 537 F.3d at 457 n.13.

[273] Mot. to Vacate 64.

"use." Indeed, in considering the various meanings of "use," the Supreme Court interpreted that term to include, "most obviously, firing or attempting to fire a firearm." Defendants have not demonstrated how employing the term "discharge" failed to provide notice or otherwise charge a crime. There is no plain error here.[274]

The charge in the indictment of "discharging" a firearm during and in relation to a crime of violence, rather than "used" a firearm during and in relation to a crime of violence, did not render the indictment fatally defective. An objection by his trial counsel on that ground at trial would have been unavailing. Movant suffered no prejudice and his claim is without merit.

> 6.      **Failure to Challenge Jurisdictional Elements of Counts One, Two, and Three**

Movant next contends that his Sixth Amendment rights were violated because his trial counsel failed to conduct appropriate factual and legal research regarding the jurisdictional elements of counts one, two, and three, and adequately subject the Government's jurisdictional evidence to adversarial testing. Counts one, two, and three alleged Movant committed assaults "within the special maritime and territorial jurisdiction of the United States."[275] "Special maritime and territorial jurisdiction" includes "any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof."[276] Thus, the three counts contain a jurisdictional element, and it was the Government's burden at trial to prove the alleged crime occurred "within the special maritime and territorial jurisdiction of the United

---

[274] *Ramos*, 537 F.3d at 459.

[275] 18 U.S.C.A. §113(a) (West 2011).

[276] 18 U.S.C.A. § 7(3) (West 2011).

States."[277]

The evidence at trial showed the shooting took place on land immediately adjacent to the United States-Mexico border in El Paso County, Texas. As Movant conceded in his motion, the Government demonstrated that his actions took place on land that was within the federal jurisdiction of the United States. Special Agent Christopher Sanchez testified that the incident occurred on United States Government property which "starts at the foot of the north slope of the levee" and "goes to the middle of [the] Rio Grande."[278] The jury was required to find this element as to counts one, two and three. As the jury convicted Movant on all three counts, the Government proved the jurisdictional element beyond a reasonable doubt.[279] Movant did not contest the Court's subject matter jurisdiction at trial, and he did not raise the issue on appeal as a "plain error."

In his motion, Movant fails to demonstrate directly controlling precedent—or any precedent, for that matter—that shows his actions did not take place within the special maritime and territorial jurisdiction of the United States. Thus, his argument is based on his conjecture that jurisdiction is "unclear."

Moreover, the Secretary of State—acting through the Commissioner of the International Boundary Commission—is formally "authorized to conduct technical and other investigations relating to the defining, demarcation, fencing, or monumentation of the land and water boundary

---

[277] *Id.*

[278] 24 R. 93–94.

[279] *Ramos*, 537 F.3d at 446, 465–66.

between the United States and Mexico, to flood control . . ."[280]  Under this authority, the United

States and Mexico entered into a convention in 1933 entitled "Rectification of the Rio

Grande."[281]  The purpose of the convention was to relieve the area of flood dangers and to secure

the stabilization of the international boundary line.  Lands within the demarcated area were

acquired in full ownership by the United States Government without encumbrance of any kind

and without private national titles.  The land at issue falls within the rectification area mapped

out by this convention.

Congress also gave the President authority to construct projects provided for in treaties

with Mexico, or to maintain projects already under construction.[282]  In constructing these

projects, the United States has entered into various agreements with individual states in the

border area.  Movant mentions the Texas Natural Resources Code, Section 11.018, which cedes

land in the bed and banks of the Rio Grande River to the United States:

> (a) To facilitate the project for rectification of the Rio Grande in the El
> Paso-Juarez Valley under the convention between the United States of
> America and the United Mexican States signed February 1, 1933, without
> cost to the state, all right, title, and interest of the State of Texas in and to the
> bed and banks of the Rio Grande in El Paso County and Hudspeth County
> which may be necessary or expedient in the construction of the project is
> ceded to the United States of America.
>
> (b) This cession is made on the express condition that the State of Texas
> retain concurrent jurisdiction with the United States of America over every
> portion of land ceded which remains within the territorial limits of the United
> States after the project is completed so that process may be executed in the

---

[280] 22 U.S.C.A. 277a (West 2011).

[281] 48 Stat. 1621; TS 864; 9 Bevans 976.

[282] 22 U.S.C.A. § 277b(a).

same manner and with the same effect as before the cession took place.[283]

This Texas statute lays out the agreement it made with the United States: the border area in El Paso County lies within the concurrent criminal jurisdiction of the United States and Texas governments. The law as to federal jurisdiction at the Rio Grande River is not unclear. Movant has shown neither deficient performance nor prejudice. He is not entitled to relief on this claim.

### 7.      Failure to Call a Use-of-Force Expert

Movant alleges that his trial attorneys were ineffective for failing to call an expert witness regarding the use of force.[284] Whether an officer has used excessive force is judged by a standard of objective reasonableness, which requires a jury to determine whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force.[285] "The calculus of reasonableness must embody an officer's use of allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[286] Movant claims his use-of-force expert, former Border Patrol Agent Jose Villarreal, was available to testify and would have benefitted his cause.

The criteria for an agent's use of force were explained to the jury a number of times throughout the trial. Movant's own attorney skillfully elicited comprehensive testimony from the

---

[283] *See* Tex. Nat. Res. Code § 11.018 (Vernon 2011) (Acts 1977, 65th Leg. p. 2351, ch. 871, art. I, § 1, eff. Sept. 1, 1077).

[284] Mot. to Vacate 78.

[285] *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).

[286] *Id.* at 97.

Government's witness, Supervisory Agent Richards, which provided a basis for arguing the main points of Movant's use-of-force defense.

> Q. Now you were talking about the firearms policy. And an agent is entitled to use deadly force when he reasonably believes it's necessary to protect his life or the life of another or to protect himself or another from grievous bodily injury, correct?
>
> A. Or death. That is correct.
>
> Q. Or death. That's right.
>
> And you'll agree with me that the determination of when that type of use of force is appropriate is something that has to be made in an evolving situation—often in a split second, right?
>
> A. Yes, sir.
>
> Q. An agent is not required to wait to get shot to make sure that the object he thinks is being pointed at him is actually a pistol, right?
>
> A. That's correct.
>
> Q. Okay. And the agent is entitled to take into account the totality of the circumstances in making that determination. Is that correct?
>
> A. I would think that would be reasonable.
>
> Q. Okay. And the fact, if any, that the—that the agent pursues somebody who's refused an order to stop would be one factor he could consider, correct? And I'm not saying that that, by itself, would be sufficient. I'm just saying it's a factor that would weigh into the balance.
>
> A. Yes.
>
> Q. The fact that the person he's attempting to stop has been in some type of physical confrontation with another agent is a factor he could consider, correct?
>
> A. Could you repeat that?
>
> Q. Yeah. If—if an agent sees a fleeing suspect get into some kind of little altercation of some kind with another agent, that's a factor he can consider in—
>
> A. Yes. Yes.
>
> Q. If an agent hears gunfire, that's a factor he can consider, isn't it?
>
> A. Yes.
>
> Q. And if an agent knows that a fellow agent has felt the need to fire his weapon, that's a factor he can consider, correct?

A. Yes.

Q. Okay. . . . and the fact that the person that's fleeing is suspected of drug trafficking is also a factor that the agent could take into consideration?

A. That's correct.

Q. And the fact that the agent is—is on the border instead of, say, in a mall or in downtown El Paso, is another factor that might play into his calculations, right?

A. Yes, sir.

Q. And if, in that situation an agent believes that someone is pointing a weapon at him, or even sees something that he can reasonably mistake for a weapon, it would be reasonable for him to defend himself, correct?

A. I think I would have to walk in their shoes, sir. But yes, that could be an articulable fact.

Q. And it's hard to figure these things out after the fact sometimes, isn't it?

A. Yes.

Q. The question is whether the agent has a reasonable belief, and it's not ultimately whether that belief turns out to be well-founded or correct. Do you agree?

A. Yes.[287]

Movant counters "both the first and second redirect examinations of Agent Richards by the government . . . significantly diluted the potential impact of Mr. Peters' . . . cross-examination of Richards."[288] However, the Court notes Movant's counsel was able to make the same use-of-force arguments that could have made if Movant's own expert had been called. Moreover, as to the lack of prejudice, as the Fifth Circuit determined, "[f]or the most part, the trial of this case was about credibility, and although the jury could have gone either way, it chose *not* to believe the defendants' version of the crucial events of February 17."[289] The Fifth Circuit

---

[287] 26 R. 263-66.

[288] Reply 30.

[289] *Ramos*, 537 F.3d at 466 (emphasis added).

added in a footnote that "[t]he jury rejected their claim of a credible threat justifying their actions."[290]  Movant cannot demonstrate reasonable probability that—if his trial counsel had employed an expert witness—the result of the proceeding would have been different.  He is not entitled to relief on this claim.

### 8.    Failure to Request a Theory-of-Defense Jury Instruction

Next, in a related claim, Movant alleges that his counsel were ineffective for failing to request jury instructions on his theory of defense and object to the Court's instructions to the jury.  He asserts the instructions given by the Court did not encompass his theory of defense which was that he used objectively reasonable force and acted in his own self-defense, and in the defense of his fellow border patrol agent, based on what he reasonably believed was an actual and apparent danger.

On direct appeal, the Fifth Circuit determined "[t]he jury instructions did explain the law relating to self-defense and defense of others, as well as the objective reasonableness standard necessary for the use of force."[291]  Moreover, it explained Movant was not entitled to a preferred wording in the jury instructions.[292]  In sum, Movant is now arguing that even though, as the Fifth Circuit held, the instructions were legally sufficient, were not erroneous, and adequately allowed for his theory of defense, the instructions should have been worded more favorably to him.  This is an insufficient basis to establish a constitutional violation.  Movant has not demonstrated that, as to the jury instructions, counsels' performance was deficient or that the deficient performance

---

[290] *Id*. at 457 n.13.

[291] *Id*. at 465

[292] *Id.*

prejudiced the defense. He is not entitled to relief on this claim.

### 9. Failure to Request an Apparent Danger Jury Instruction

In a very similar claim, Movant contends that his counsel was ineffective for failing to "request a substantially correct jury instruction on self-defense that included 'apparent danger,' and object to the Court's Instructions To The Jury" on the ground that the self-defense instruction failed to include apparent danger'"[293] Again, the Fifth Circuit addressed this issue in Movant's direct appeal:

> Lastly, the defendants argue generally that the jury instructions did not adequately include their theory of defense. The jury instructions did explain the law relating to self-defense and defense of others, as well as the objective reasonableness standard necessary for the use of force. These instructions reflected the defendants' contention that, in firing their weapons, they were responding defensively to behavior by Aldrete-Davila that they perceived as threatening. To the extent that the defendants argue that the instructions could have better explicated the theory of the defense, they are not entitled to a preferred wording in the jury instructions. *See United States v. Simmons*, 374 F.3d 313, 319 (5th Cir. 2004). And, while the instructions for the § 924(c)(1)(A) charges do not reference a theory of defense, they do make clear that conviction for the predicate offenses is required for conviction under § 924(c)(1)(A); the instructions for each of these predicate offenses, as discussed above, contained adequate theories of defense. *See United States v. Natel*, 812 F.2d 937, 942 (5th Cir.1987). In short, these instructions were not erroneous and certainly do not rise to the level of plain error.[294]

Thus, the instructions embraced the use of force as an appropriate response to perceived threatening behavior. Under the instructions as given, if Aldrete appeared ready to use unlawful deadly force against Movant or others, then Movant would have a reasonable belief that use of force was necessary for the defense of himself or others.

---

[293] Mot to Vacate 92.

[294] *Ramos*, 537 F.3d at 465.

Movant's counsels' performance was not deficient, as the jury instructions did explain the law relating to self-defense and the defense of others, as well as the objective reasonableness standard necessary for the use of force. These instructions contemplated Movant's contention that, in firing his weapon, he was responding defensively to behavior by Aldrete which he perceived as threatening. Movant has not met his heavy burden of demonstrating prejudice. He is not entitled to relief on this claim.

### 10.    Failure to Object to Jury Instructions

In still another related claim, Movant contends that his trial counsel was ineffective for failing to propose different jury instructions as to the use of force and to object to the lack of their inclusion. He further contends that it was ineffective assistance for his counsel to fail to object to the deprivation-of-rights instruction based on (1) the Court's definition of "willfully"; (2) the omission of the burden of proof from the deprivation-of-rights instructions; and (3) the reference to the reasonableness of force in a custodial situation.

As stated in the response to the previous two claims, the Fifth Circuit determined the instructions given by the Court were "not erroneous."[295] According to the Court of Appeals, the instructions, as given by the Court, adequately allowed for Movant's defensive theories.

> The jury instructions did explain the law relating to self-defense and defense of others, as well as the objective reasonableness standard necessary for the use of force. These instructions reflected the defendants' contention that, in firing their weapons, they were responding defensively to behavior by Aldrete-Davila that they perceived as threatening. To the extent that the defendants argue that the instructions could have better explicated the theory of the defense, they are not entitled to a preferred wording in the jury

---

[295] *Ramos*, 537 F.3d at 465.

instructions.[296]

Further, the Court properly defined "willfully." The Fifth Circuit's pattern instructions for the second element of the deprivation of rights under color of law, in violation of 18 U.S.C. § 242, provides that the jury must find "[t]hat the defendant acted willfully, that is, that the defendant committed such act or acts with a bad purpose or evil motive, intending to deprive the victim of that right."[297] The actual jury instructions charged that, for the second element of the deprivation-of-rights count, the jury had to find, beyond a reasonable doubt, that Movant acted "willfully," that is, that he acted "with a bad purpose or evil motive," intending to deprive the victim of a right secured by the Constitution or laws of the United States.[298] Thus, the Court's instruction as to the "willfully" element exactly tracked the pattern instructions. Further, the Fifth Circuit's opinion explained:

> [ Movant's] complaint confuses the criminal mental state required by § 242 with the independent reasonableness analysis related to the use of force. In any event, [his] argument is foreclosed by *United States v. Sipe*, 388 F.3d 471, 480 & n.21 (5th Cir. 2004), in which we specifically approved of the instruction given here defining "willfully."[299]

In his direct appeal, Movant also argued that the burden of proof was either misplaced or omitted from the § 242 instructions.[300] The Fifth Circuit found that:

---

[296] *Id.*

[297] Fifth Circuit Pattern Jury Instructions (Criminal) § 2.18 (2001).

[298] Jury Instructions at 42.

[299] *Ramos*, 537 F.3d at 464.

[300] *Id.*

The instructions, however, expressly state that the government must prove all elements of § 242 beyond a reasonable doubt. That the district court did not repeat the government's burden of proof when it gave a more detailed explanation of the § 242 elements does not create plain error.[301]

Movant also maintained before the Fifth Circuit that "the § 242 jury instructions constructively amended the indictment by a brief reference to the reasonableness of force that police exercise in a custodial situation, a factual situation that was not charged in the indictment."[302] The Fifth Circuit determined:

> This brief reference is not plain error; the defendants do not claim that their convictions were premised on anything other than evidence related to the force that may be used in self-defense or defense of another. *See United States v. Phillips*, 477 F.3d 215, 221 (5th Cir. 2007). The evidence offered during trial was focused solely on this issue, that is, whether use of their weapons was justified for their safety or the safety of others; the government did not try its case on any other basis than that charged in the indictment. *See United States v. Mitchell*, 484 F.3d 762, 772 (5th Cir. 2007). As a result, there is no plain error. *See United States v. Longoria*, 298 F.3d 367, 371 (5th Cir. 2002).[303]

The Fifth Circuit concluded, "[i]n short, these instructions were not erroneous and certainly do not rise to the level of plain error."[304] Movant was not entitled to a "preferred wording" in the jury instructions. Objections to the deprivation-of-rights instruction—which mirrored the Fifth Circuit pattern jury instruction—would have been unavailing. Accordingly, Movant cannot show his counsels' performance was deficient or that the purported deficient

---

[301] *Id.*

[302] *Id.* at 465.

[303] *Id.*

[304] *Id.*

performance prejudiced his defense.

### 11.    Failure to Request Limiting Instructions on Border Patrol Policies

Movant asserts that his trial counsel were constitutionally ineffective by failing to request appropriate limiting instructions regarding the violations of the four Border Patrol policies and object to the Court's instructions to the jury due to the absence of such a limiting instruction. Movant acknowledges that his trial counsel successfully proposed a limiting instruction for the obstruction-of-justice counts, counts eight and nine:

> The duty to report the discharge of a firearm is a civil regulation which requires an employee of the U.S. Border Patrol to orally advise a supervisor within one hour if a firearm is discharged. The violation of this regulation should not be considered a violation of criminal law. You may consider, however evidence of violations of civil regulations as you would any other evidence in determining whether the defendant had the required intent to violate the criminal laws charged in this indictment. In other words, violation of a firearm discharge reporting rule should not be considered a violation of criminal law. You may consider this evidence, however, as you would any other evidence in determining whether the defendants had the required intent to commit any of the crimes charged in the indictment.[305]

Movant complains that it was ineffective assistance not to request similar instructions as to the other counts and with regard to all policies.

As discussed above, on direct appeal, the Fifth Circuit rejected the complaint that evidence showing Movant violated a number of Border Patrol policies in pursuing and firing upon Aldrete produced a trial in which the Border Patrol policies were substituted for the actual crimes charged.[306] It pointed out that evidence of policy violations covering "such matters as

---

[305] Jury Instructions at 33, 35-36, 38.

[306] *Ramos,* 537 F.3d at 447, 459.

high-speed pursuits, reporting firearm discharges, preserving evidence, and the use of deadly force" was admitted by the Court "as relevant to intent and knowledge of wrong-doing relating to the defendants' crimes."[307]  The Fifth Circuit rejected Movant's contention that the Government's constant references to and emphasis on Movant's disregard of established policies had the effect of allowing the policies to become the issue of conviction instead of the real issue–whether Movant had violated substantive criminal laws.[308]  The Fifth Circuit explained why the circumstances in Movant's case prevented an error as to the misuse of civil regulations and served to protect against prejudice:

> Before trial, the district court explicitly prohibited the government from making any statement implying that violation of Border Patrol policies could be considered illegal.  And at trial, the government never suggested that violation of one of the policies was sufficient for conviction. Instead, the government only used the policies as evidence of the state of mind of the defendants for crimes of violence, which had no dependency on the policies for their definition, essence, or viability. . . .[309]

Additionally, "testimony in this case was elicited by the defendants to the effect that violation of Border Patrol policies was not identical to a violation of criminal law."[310]  Further, "the jury here was not told that it had to decide whether the defendants violated the policies in order to establish criminal culpability."[311]  Finally, "[t]he district court repeatedly admonished the jury that it was

---

[307] *Id*. at 459.

[308] *Id.*

[309] *Id.* at 460.

[310] *Id.*

[311] *Id.*

only to consider guilt in terms of the crimes actually charged in the indictment."[312]

The precautions taken by the Court as to the regulation of evidence, the instructions as to counts eight and nine, the jury instructions taken as a whole, and the manner in which the evidence was received, eliminated the possibility that regulatory violations were bootstrapped into criminal liability. As the Fifth Circuit concluded, "the defendants were properly convicted of substantive crimes, not for violating Border Patrol policies."[313] Movant cannot show his counsels' performance was deficient or the purported deficient performance prejudiced his defense. Accordingly, Movant is not entitled to relief on this claim.

### 12.    Failure to Object to Closing Argument

In his last claimed instance of ineffective assistance of counsel, Movant asserts his trial counsel rendered constitutionally ineffective assistance by failing to object to portions of the government's jury argument. He believes the prosecutor's "good shoot" argument—that if it was a "good shoot" Movant would have reported it—sought to convict Movant based on his failure to report the discharge of his weapon, in violation of the policy mandating an oral report within an hour of any shooting. Movant also argues the prosecutor's "no weapon" argument—that because Aldrete did not have a weapon, Movant's shooting was not justified—deprived him of the defense that he was responding to an apparent threat or apparent danger.

A prosecutor is "not permitted to make an appeal to passion or prejudice calculated to

---

[312] *Id.*

[313] *Id.* at 466.

inflame the jury."[314]  "A prosecutor is confined in closing argument to discussing properly admitted evidence and any reasonable inferences or conclusions that can be drawn from that evidence."[315]

The record shows Movant testified he thought Aldrete had a weapon.  Accordingly, his counsel argued:

> [Movant] came up on a situation where he believed that this fleeing suspect was in a gunfight with his fellow officer.  He came to this officer's aid.  He believed he saw a weapon in his hand, and he took the correct step in that situation.[316]

The prosecutor acknowledged the defense argument that a shiny object in Aldrete's hand could have posed a threat to Movant and others.  The prosecutors's focus on the lack of evidence of an actual weapon—based in part on a reasonable inference that Movant had a guilty state of mind based on the evidence that he failed to report the shooting—was not improper.  As the Fifth Circuit concluded:

> For the most part, the trial of this case was about credibility, and although the jury could have gone either way, it chose not to believe the defendants' version of the crucial events of February 17.  The trial of the case was conducted fairly and without reversible error.[317]

Movant has not demonstrated that his counsels' performance was deficient or that the deficient performance prejudiced his defense.  He is not entitled to relief on this claim.

---

[314] *United States v. Crooks*, 83 F.3d 103, 107 n.15 (5th Cir. 1996).

[315] *United States v. Vargas*, 580 F.3d 274, 278 (5th Cir. 2009).

[316] Tr. of March 6, 2006, at 38.

[317] *Ramos,* 537 F.3d at 447.

### D.    Prejudicial Spillover

Movant "asserts that the Fifth Circuit's failure to consider the 'prejudicial spillover' effect of the vacated, obstruction of justice counts . . . was 'dead wrong' and legally inadequate to protect his right to due process, a meaningful appeal, and full and fair appellate review."[318]  He notes the Fifth Circuit vacated all of the obstruction-of-justice counts.  He argues the "prejudicial spillover" justified relief on the non-vacated counts.

Movant raised the "prejudicial spillover" issue in a petition for rehearing *en banc*.[319]  The Fifth Circuit denied the petition.  "It is well settled that, absent countervailing equitable considerations, a § 2255 movant cannot re-litigate issues raised and decided on direct appeal.[320] "[I]ssues raised and disposed of in a previous appeal from an original judgment of conviction are [generally] not considered in § 2255 Motions."[321]  Movant maintains "[w]hile the Fifth Circuit did not grant hearing *en banc*—and thus did not address the spillover prejudice arguments that were in that petition for en banc rehearing—the decision not to grant *en banc* review was not a ruling on the merits."[322]  Assuming, *arguendo*, that the Fifth Circuit did not rule on the merits, relief under § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that *could not have been raised on direct appeal* and, if condoned, would result in a

---

[318] Mot to Vacate 121.

[319] *See* Fifth Circuit docket sheet No. 06-51489. (Ramos's Petition for Rehearing En Banc, filed August 15, 2008).

[320] *United States v. Rocha*, 109 F.3d 225, 229 (5th Cir. 1997).

[321] *United States v. Kalish*, 780 F.2d 506, 508 (5th Cir. 1986) (citing *United States v. Jones*, 614, F.2d 80, 82 (5th Cir.1980)).

[322] Reply 19.

complete miscarriage of justice.[323]   Accordingly, the Court will not address this issue.

### E.    Cumulative Error

Finally, Movant argues the Court should apply "the doctrine of cumulative error . . .

because, viewing everything that occurred at trial, he was denied a fair and reliable trial, as

guaranteed by the Fifth Amendment to the Constitution of the United States."  He adds "[t]he

combined, aggregated prejudice of these errors is so significant that he is entitled to a new

trial."[324]

Here, however, there was no cumulative error as there was no error.  The Fifth Circuit

specifically concluded that "the evidence fully supports the jury verdict."[325]  It's conclusion, as

the Government suggests, is worth recounting:

> For the most part, the trial of this case was about credibility, and although the
> jury could have gone either way, it chose not to believe the defendants'
> version of the crucial events of February 17.  The trial of the case was
> conducted fairly and without reversible error.  The exclusion of evidence
> relating to the size of the marijuana load and Aldrete-Davila's alleged
> involvement in drug-trafficking events of October 2005 did not violate the
> defendants' Sixth Amendment rights to present a complete defense nor did
> it deny them a proper cross-examination of a witness against them.  They
> were denied no right of due process for lack of notice that § 924(c) could be
> applied to police officers while performing law enforcement duties.  Nor was
> the § 924(c) indictment defective.  Moreover, the defendants were properly
> convicted of substantive crimes, not for violating Border Patrol policies.  In
> instructing the jury, no reversible errors were committed and, finally, the
> evidence fully supports the jury verdict.  We therefore affirm the convictions
> for counts 1 through 5 and counts 11 and 12 [and reverse and vacate the

---

[323] *United States v. Vaughn*, 955 F.2d 367, 368 (5th Cir.1992).

[324] Mot. to Vacate 123.

[325] *Ramos,* 537 F.3d at 466.

convictions for obstruction of justice . . . counts 6 through 10].[326]

## IV.    EVIDENTIARY HEARING

A motion brought under § 2255 may be denied without a hearing if the motion, files, and records of the case conclusively show that the defendant is not entitled to relief.[327]  The record in this case is adequate to dispose fully and fairly of Movant's claims.  The Court need inquire no further on collateral review and an evidentiary hearing is not necessary.

## V.    CERTIFICATE OF APPEALABILITY

A petitioner may not appeal a final order in a habeas corpus proceeding "[u]nless a circuit justice or judge issues a certificate of appealability."[328]  Further, appellate review of a habeas petition is limited to the issues on which a certificate of appealability is granted.[329]  In other words, a certificate of appealability is granted or denied on an issue-by-issue basis, thereby limiting appellate review solely to those issues on which a certificate of appealability is granted.[330] Although Movant has not yet filed a notice of appeal, this Court nonetheless must

---

[326] *Id.*

[327] *Cf. United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992) (per curiam) (holding that there was no abuse of discretion in denying a § 2255 motion without a hearing where the movant's assertions of ineffective assistance were wholly conclusory in nature and refuted by reference to the record itself).

[328] 28 U.S.C.A. § 2253(c)(1)(B) (West 2011).

[329] *See Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997) (holding that, in regard to the denial of relief in habeas corpus actions, the scope of appellate review is limited to the issues on which a certificate of appealability is granted).

[330] *See* 28 U.S.C.A. § 2253(c)(3) (setting forth the narrow scope of appellate review in habeas corpus matters); *see also Lackey*, 116 F.3d at 151 (holding that a certificate of appealability is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *but see United States v. Kimler*, 150 F.3d 429, 431 n.1 (5th Cir. 1998) ("We have decided, however, that the monolithic nature of

address whether he is entitled to a certificate of appealability.[331]

A certificate of appealability "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."[332]  In cases where a district court rejects a petitioner's constitutional claims on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[333]  To warrant a grant of the certificate as to claims that the district court rejects solely on procedural grounds, the movant must show both that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."[334]  Here, Movant's motion fails because he has not made a substantial showing of the denial of a constitutional right.  Accordingly, the Court finds that it should deny Movant a certificate of appealability.

---

[Federal Rule of Appellate Procedure] Rule 22(b) in conjunction with Congress's mandate for issue specificity on collateral review embodied in 28 U.S.C. § 2253(c)(3) requires a more express request.  In order to obtain appellate review of the issues the district court refused to certify, the petitioner must first make the threshold substantial showing of the denial of a constitutional right. *See* 28 U.S.C. 2253(c)(2). Only after clearing this hurdle may the petitioner proceed to brief and we review the merits of the rejected issues.").

[331] *See* 28 U.S.C.A. § 2255 Proc. R. 11(a) (West 2011) ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."); *Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (explaining that it is appropriate for a district court to address *sua sponte* the issue of whether it should grant or deny a certificate of appealability, even before one is requested).

[332] 28 U.S.C.A. § 2253(c)(2).

[333] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also United States v. Jones*, 287 F.3d 325, 329 (5th Cir. 2002) (applying *Slack* to a certificate of appealability determination in the context of § 2255 proceedings).

[334] *Slack*, 529 U.S. at 484.

## VI.     CONCLUSION AND ORDERS

For the reasons stated, the Court concludes that it should deny Movant's motion and dismiss his civil cause. The Court further concludes that Movant is not entitled to a certificate of appealability. Accordingly, the Court enters the following orders:

1.     All relief requested by Movant Ignacio Ramos, Jr., in his motion to vacate, set aside, or correct a sentence pursuant to 28 U.S.C. § 2255 [ECF No. 291], and his reply to the Government's response [ECF No. 299], is **DENIED**, and his civil cause is **DISMISSED WITH PREJUDICE**.

2.     Movant Ignacio Ramos, Jr., is **DENIED** and evidentiary hearing.

3.     Movant Ignacio Ramos, Jr., is **DENIED** a **CERTIFICATE OF APPEALABILITY**.

4.     All pending motions in this cause, if any, are **DENIED AS MOOT.**

**SO ORDERED.**

**SIGNED** on this **3rd day of January, 2012.**

_Kathleen Cardone_
_____

**KATHLEEN CARDONE**
**UNITED STATES DISTRICT JUDGE**